**Lavinia G. TATE et al., Plaintiffs,**

v.

**DEPARTMENT OF CONSERVATION AND DEVELOPMENT, Raymond V. Long, Director, et al., Defendants.**

**Civ. A. No. 1295.**

United States District Court
E. D. Virginia, Norfolk Division.

July 7, 1955.

Victor J. Ashe, J. Hugo Madison, Norfolk, Va., James A. Overton, Portsmouth, Va., for plaintiffs.

J. Lindsay Almond, Jr., Atty. Gen., Virginia, Henry T. Wickham, Sp. Asst., Richmond, Virginia, for defendants.

HOFFMAN, District Judge.

Seashore State Park, located in Princess Anne County at or near Cape Henry, is one of nine state parks scattered throughout Virginia. All of these parks have been maintained and operated under the supervision and control of the Department of Conservation and Development, an agency of the Commonwealth of Virginia. The parks, with their attendant recreational facilities, are supported by the taxpayers of Virginia, although charges are made for the individual use of cabins and other special purposes. By reason of its location on the Chesapeake Bay, Seashore State Park is extremely popular and, from a financial standpoint, is the most profitable of all parks in Virginia.

On June 16, 1951, the four named plaintiffs sought the use of the recrea-

tional facilities at Seashore State Park, but were denied admission solely by reason of the fact that they were members of the Negro race. Five days later they instituted this proceeding as a "class action" naming as parties defendant the Department of Conservation and Development, Division of Parks, its Director, and various other individuals related to the maintenance and operation of the Park in controversy. In substance, the complaint is a proceeding by way of declaratory judgment seeking an injunction against future violations because of the denial of plaintiffs' constitutional rights. The prayer for relief requests a permanent injunction against the defendants, their *lessees*, agents and successors in office.

The defendants, while admitting plaintiffs' rights in the use of the Park as a settled principle of law, vigorously urge that no decree may be entered by this Court which will have the force and effect of limiting the right to lease the Park. It is the contention of the defendants that the Virginia statute authorizes the leasing of any or all of the state parks and that, as long as no express provision is contained in the lease which would deprive plaintiffs of their constitutional rights, the normal lessor-lessee relationship would be applicable, thus permitting the lessee to establish his own rules and regulations as to use and occupancy. On the evidence presented, defendants insist that there has been no showing of threatened irreparable harm to justify a permanent injunction which would affect a lease agreement to be hereafter executed.

The present action has remained dormant on the docket of this Court since defendants filed their answer on July 16, 1951, until March 12, 1955, when plaintiffs were granted leave to file an amended complaint substituting a successor defendant and requesting a preliminary, as well as a permanent, injunction. On this latter date the Court, upon motion for a preliminary injunction, granted same, thereby restraining the leasing of Seashore State Park. In compliance with the Court's order plaintiffs gave bond in penalty of the sum of $25,000. The matter now comes before this Court on the application for permanent injunction.

The reasons for delay in prosecution are unknown to the Court, although the file indicates that the matter was continued generally on motion of counsel for plaintiffs, in which motion the Attorney General of Virginia joined. At a pre-trial conference on Novmber 5, 1954, the matter was set for trial on April 26, 1955. The April hearing resulted in an informal conference, including a stipulation as to certain facts, and an agreement that the original answer would stand as an answer to the amended complaint. Thereafter briefs were filed and the Court, upon request of plaintiffs, fixed June 29, 1955, for the purpose of taking the testimony of Raymond V. Long, Director of the Department of Conservation and Development, and hearing argument of counsel. This opinion follows.

It is interesting to note that there was no *specific* consideration given to leasing any of the state parks until after the pre-trial conference on November 5, 1954. According to Long there had been some general discussion in April, 1953, on the subject of competition with private enterprise occasioned by the use of cabins for overnight accommodations. Since the State operated all parks in 1954 on a so-called competitive basis and, during the 1955 season, has elected to similarly operate all parks excepting the one which is the subject matter of this action, it may be fairly assumed that the State has not yet given serious consideration to the abolition of any such competition, if any, with private enterprise. The State elected not to operate Seashore State Park, although the Court's preliminary injunction only restrained the leasing of the Park and its facilities.

The Attorney General of Virginia addressed a letter to the Director, Raymond V. Long, on November 26, 1954, pointing out the serious impact on state parks

by reason of any adverse decision in the pending case. Thereafter, at the Board meeting of January 13, 1955, representatives of the Attorney General's office were present and explained the involved problems in connection with the continued operation of Seashore State Park. At the same meeting a motion was adopted authorizing the Director to "negotiate a proper lease of the Seashore State Park, with the consent and approval of the Governor, and with the advice and approval of the Attorney General and the Executive Committee of the Board, for the season of 1955".

In response to a press release on February 25, 1955, 18 applicants expressed an interest in leasing the park in controversy. According to the evidence the matter of an "open bid" or "highest bid" was rejected in favor of a "negotiated lease"; the reasons assigned being that the State was interested in obtaining a lessee "whose attitude promised to offer the most by way of recreational facilities to those who wished to benefit by them".

The following question propounded to the Director and answered by him rather concisely states the purpose in the contemplated leasing:

"Q. Why did the Board decide to lease the park that was bringing in the most revenue when it was a question of revenue? A. Well, I think that was explained in previous question and answer, that that was a large revenue producing park, Seashore, and that we could not under the State's declared policy operate it on an unsegregated basis, and in view of the pending litigation we probably would not be able to operate it on a segregated basis, and rather than lose that lucrative income it was deemed wise to undertake leasing Seashore as the first in this contemplated series of leasings".

With all due respect to the able leaders of this Commonwealth, it is perfectly apparent to the Court that the fundamental reason for the contemplated leasing lies in the problem of use by members of all races. It is probably true that financial reasons are paramount, but the potential financial loss is brought about by the decisions of many courts, State and Federal, universally holding that property acquired, maintained, and operated by the Federal, State and local governments shall be made equally available to all races, subject to reasonable rules and regulations. The proposed "negotiated lease" effectively vests in the hands of a small group the power to accomplish by indirection exactly what all Courts have said cannot be done. The control exercised in a "negotiated lease" through the medium of "selecting" the lessee is as powerful as the actual words of any written lease.

The history of the Virginia park system is of interest in approaching the general subject now before the Court. A State Commission on Conservation and Development was established by authority of the General Assembly of Virginia in 1926, Acts of Assembly 1926, Chap. 169. The Commission was authorized and empowered to adopt all rules and regulations for the proper disposition and administration of any property acquired or over which it gained control. The legislative history through 1954 fails to mention the subject of "race" in any of its pronouncements relating to state parks. The acts appropriating funds for the park system make no reference to "white" or "colored" parks as such. The original Act states that the acquisition, preservation and maintenance of properties is for "the use, observation, education, health and pleasure of the people of Virginia". With no equal facilities made available to members of the colored race, it is a source of some amazement that this question has not heretofore been decided in Virginia.

The establishment of the state park system in Virginia is an outgrowth of the depression days of the early thirties. The report of W. E. Carson, Commission Chairman, showing the history and activities from 1926 to 1935, discloses that, in 1933, President Roosevelt authorized

the use of the CCC in building seven of Virginia's nine parks. The estimated expenditure by the Federal Government in these seven parks was in excess of $4,000,000, whereas the Legislature of Virginia appropriated only $50,000. By reason of some declared policy, the source of which is unknown, the first eight state parks were reserved for use by "the people of Virginia" who were members of the white race. In 1950 the Prince Edward County State Park was established for Negroes and, at the present time, is being operated at a financial loss. All other parks, except the Staunton River Park, are financially profitable.

A revenue bond issue in 1950 yielded $600,000, against which there remains an indebtedness of $415,000. The primary purpose of the bond issue was to erect 67 cabins at an approximate cost of $8,000 each. Nine of these cabins are at Seashore State Park. These bonds are secured from revenue only and carry no legal obligation to pay on the part of the Commonwealth of Virginia. There is no lien on the real estate as such. The rights of the bondholders, if any, are not before this Court and the trust indenture was not introduced in evidence.

The right of the State to lease its property is not controverted by the plaintiffs herein. The existing statute, Sec. 10–21.1, Code of Virginia, 1950, was amended in 1952 to read as follows:

"The Director is hereby authorized and empowered, subject to the consent and approval of the Governor, to convey, lease or demise to any responsible individual, organization, association or corporation for such consideration and on such terms as the Board may prescribe, by proper deed or other appropriate instrument signed and executed by the Director, in the name of the Commonwealth, any lands or other properties held for general recreational or other public purposes by the Commonwealth, for the Department, or over which it has supervision and control, or any part or parts thereof or right or interest therein or privilege with respect thereto. The Governor is also hereby authorized and empowered to direct the discontinuance of the operation of any or all State parks when in his judgment the public interest so requires.

"Any such conveyance, lease or grant herein authorized shall be subject to such further provisions, conditions, restrictions and reservations as may be approved by the Governor and prescribed by the Director."

The 1952 General Assembly of Virginia, in enacting the amendment as aforesaid, deleted the words "or group of individuals" and inserted the words "individual" and "association or corporation". It will be observed that the existing statute, prior to 1952, restricted the right of the Director to leasing only such property as was "not needed" by the Department of the State for general recreational or other public purposes, and further contained a limitation of 25 acres in any one park or recreational area which could be leased. The General Assembly in 1952 eliminated the words "not needed" and removed the restriction as to acreage. It further added a provision that the Governor of Virginia was authorized and empowered to direct the discontinuance of any or all state parks when in the Governor's judgment the public interest so required. The final paragraph of the amended statute, as well as the first paragraph, gave the authority to the Director to "convey" as well as to lease or demise. While the intent and purpose of the General Assembly is not revealed by the wording of the statute, it leaves this Court to believe that the true purpose of the 1952 amendment was to enable the Director to meet the ever increasing race problem.

The applicable law of this case is not seriously contested. While the "separate but equal" doctrine was abolished by the United States Supreme Court in the recent schools segregation cases, Brown v. Board of Education, of

Topeka, 349 U.S. 294, 75 S.Ct. 753, this is of no moment as "separate but equal" facilities have not existed at any of the state parks in Virginia. It could not be successfully argued that the establishment of a state park for Negroes in Prince Edward County (approximately 100 miles from Seashore State Park) meets the "separate but equal" test. Furthermore, the "separate but equal" doctrine as applied to the enjoyment of public beaches and bathhouses maintained by public authorities was abolished by this Circuit in Dawson v. Mayor and City Council of Baltimore City, 4 Cir., 220 F.2d 386. It follows that state parks, even where "separate but equal" facilities exist, are governed by the same general principles. The recent decisions merely show the inevitable trend to be followed by any District Judge obligated by the oath of his office to uphold the Constitution and laws of the United States. Such an oath is paramount to the aims, desires and criticisms of any individuals, regardless of race.

Contemporaneous with the decision of the United States Supreme Court in the school segregation cases, namely, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 and Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884, the highest Court of the land granted certiorari in Muir v. Louisville Park Theatrical Association, 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112, vacated the judgment, and remanded the case for further consideration in light of the segregation cases decided, and *"conditions that now prevail"*. The action after remand is not indicated, but a glance at the brief per curiam opinion of the Sixth Circuit, 202 F.2d 275, and the District Court's decision in Sweeney v. City of Louisville, 102 F.Supp. 525, will reveal the precise question involved. The contract of leasing between the City of Louisville and the Theatrical Association did not, by its terms, prohibit other organizations from using the Amphitheatre. The Sixth Circuit held that where the City of Louisville did not participate either directly or indirectly in the operation of the private enterprise, the Theatrical Association was guilty of no unlawful discrimination, in violation of the Fourteenth Amendment, in refusing admission to colored persons to its operatic performances during the summer season. In light of the remand of this case by the United States Supreme Court, it may be reasoned that the Court was of the opinion the rights of the colored persons had been violated.

The swimming pool and golf course cases [1] appear to be applicable to the instant proceeding. Certainly it is true that if members of the Negro race are to be granted relief in swimming pool cases, there is even more logical reasoning in affording like remedies to Negro citizens in state park cases. While the decisions of State Courts are not binding upon Federal Courts, they cannot, however, be totally disregarded. In Culver v. City of Warren, 84 Ohio App. 373, 83 N.E.2d 82, 88, decided July 6, 1948, the Court had before it the question of the rights of colored citizens to use and enjoy a municipal swimming pool, built at public expense with Federal and Municipal funds, where the pool was leased to a non-profit corporation. From 1934 to 1946 the pool was open to all races. During 1946 difficulties arose as to the use of the pool by Negroes and, in 1946, the City Council authorized the leasing for 1946 and 1947. No lease was consummated in 1946, but the following year brought about a lease to the Veterans Swim Club, with membership confined to veterans of all wars and their families, but all applicants had to be approved by a two-thirds secret ballot of

1. Holmes v. City of Atlanta, 5 Cir., 223 F.2d 93, the Fifth Circuit affirmed the judgment of the Northern District of Georgia holding as unconstitutional an ordinance of the City of Atlanta making it unlawful for colored people to frequent parks and golf courses maintained by the City for the use of white people and unlawful for white people to frequent or use any park maintained by the City for the use and benefit of colored persons.

lessee's executive board. The lessee confined approved applications to the white race and Negro veterans were rejected. The defendants urged that the question was whether or not a municipality had a right to lease property when it was determined that the property was no longer needed and was being operated at a financial loss. The Ohio Court held that the intent and purpose of the leasing must be carefully scrutinized and that a "colorable" leasing should be disapproved. The Court said:

"The power to lease does not include the power to discriminate against members of a minority race in the exercise of their constitutional rights."

With the general statement quoted above, this Court is in complete accord. As the lease to the Veterans Swim Club had expired, the action against this organization was dismissed, but a decree was entered against the municipality, the Court holding that the question was not "moot" if there remained anything on which a decision of the Court could operate. In the concluding portion of its opinion, the Court added:

"In conclusion we wish to emphasize that we are not here dealing with social questions involving race relationships nor with the question of whether or not the city might suffer a loss because of the use of this pool by persons of the Negro race. If this is the price that must be paid for constitutional guarantees, the price is indeed small enough. It is one thing to pay lip service to the Constitution and another thing to abide by its specific provisions".

Even the dissenting opinion in Culver v. City of Warren, supra, has this to say:

"The sale or lease of such facility or property must have been conducted in absolute good faith and such method cannot be used as a means of avoiding the constitutional obligations of the city to afford all citizens the equal protection under the law".

In Kern v. City Commissioners of City of Newton, 151 Kan. 565, 100 P.2d 709, 129 A.L.R. 1156, the Supreme Court of Kansas (a state in which segregation in public schools was permitted by statute in cities of more than 15,000 population) generally approved the leasing of a swimming pool conditioned that nothing was done to take away any of the public features of the park and its facilities, and held that when the City leased to a lessee, regardless of the terms of the lease, it would be presumed that the pool would be operated in accordance with all the provisions of the statute and the Constitution and that, among those provisions, was the one that the public generally would be admitted to the pool.

While not in any sense a segregation case, the Illinois Appellate Court held as void ab initio a lease for a portion of Lincoln Park where plaintiffs, acting under a lease for a term of 26 years, erected a club house and other improvements costing $50,000. The Court, in Lincoln Park Traps v. Chicago Park District, 323 Ill.App. 107, 55 N.E.2d 173, 176, stated that the very nature of the lease precluded the use of the premises by the public and gave to one individual the exclusive right to possess and control the same and, after reviewing the legislative acts enacted for the purpose of establishing, maintaining and governing public parks for the recreation, health and benefit of the general public, had this to say:

"All lands, the title to which is in Commissioners of park districts, are held in trust for the equal benefit of all of the people of the state, that the facilities of park districts are for the equal benefit of all the people of the state and that park districts cannot operate their facilities or permit them to be operated in such a manner that a preferential use thereof is granted to any one person or to any group of persons".

The opinion of District Judge Moore, from the Southern District of West Virginia, in Lawrence v. Hancock, 76 F.Supp. 1004, 1005, is persuasive upon this Court in the pending case. The

question stated in the action for declaratory judgment and injunction was:

"Can a municipality, by leasing a swimming pool constructed with public funds to a private association of persons, relieve itself of the constitutional obligation to afford colored citizens equal rights with those of white citizens in the use of the public recreational facilities thereby provided?"

One of the terms of the lease is strikingly similar to a condition to be inserted in the contemplated lease of Seashore State Park. The City of Montgomery lease provided that "the lessee shall have the complete and full control of said property during the term hereof and shall establish and enforce proper rules and regulations governing the operation and management of said property and its appurtenances". The Commonwealth of Virginia proposes to lease Seashore State Park under provisions (1) that the lessee may set his own rules for receiving and processing applications, (2) that the lessee may make his own rules for the conduct of renters, (3) that the lessee may determine the opening and closing dates for day use and rental of cabins, and (4) that the lessee may establish his own schedule of charges[2]. The contemplated lease of the park will *not*, however, contain any provisions, conditions, restrictions or reservations that could be construed as restricting the use of the park to members of the white race. In analyzing the effect, if any, of Lawrence v. Hancock, supra, it is noted that the City of Montgomery lease was likewise silent as to the use of the pool by members of any race. In granting the declaratory judgment and injunction against the City of Montgomery, its council and Mayor, restraining them from again denying plaintiff the right to use the swimming pool at any time when the pool was open for public use, Judge Moore said:

"The contention of the City that there is no pending controversy upon which to base a suit for a declaratory judgment is without merit. Plaintiff tried on two occasions in successive seasons to obtain admission to the pool, and each time was denied that right solely because of his race. He could hardly have done more in the attempt to enforce his constitutional right. But, it is said, the season is now ended and the lease has expired; there is no indication that the City will again lease the pool, or that plaintiff will again be denied admission [by the lessee]. In view of my conclusion that the refusal to admit him to the pool was governmental and not private action, there is no basis for this argument. The pool still exists, although temporarily closed. If it is opened to the public again, the plaintiff will be entitled to the rights he asserts. He has twice been denied these rights. It is the duty of this Court on his complaint and the evidence in its support to declare what his rights are".

Approaching the question with firmness, Judge Moore's comment is squarely to the point when he is quoted:

"It is not conceivable that a city can provide the ways and means for a private individual or corporation to discriminate against its own citizens. Having set up the swimming pool by authority of the Legislature, the City, if the pool is operated, must operate it itself, or, if leased, must see that it is operated without any such discrimination".

While it may be true that this Court should not reach out and endeavor to en-

---

**2.** This condition, as revealed by affidavit of Raymond V. Long, filed herein on April 26, 1955, is somewhat in conflict with Long's testimony wherein he states that the Department of Conservation and Development would not be interested in leasing the park to an individual who was interested "solely for the money he could make out of it". If the Department gave the lessee the full right to establish the schedule of charges, it is difficult to see how the public could be protected.

join an unknown lessee under the provisions of Rule 65(d) of the Federal Rules of Civil Procedure, 28 U.S.C.A., it becomes wholly unnecessary to determine this contention as the proposed lessors are before the Court and the point will never be raised. The short answer to the argument advanced by defendants, that there is insufficient evidence to justify a permanent injunction based upon future threatened irreparable injury, lies in the testimony of the Director (Long) in that he admits that Seashore State Park cannot be operated profitably on an "unsegregated" basis by the Department of Conservation and Development. While this Court is inclined to agree with this statement, if this be true, it stands to reason that no individual may operate the park at a profit without enforcing segregation. Should the successful lessee elect to admit Negroes only, then the members of the white race have just cause to complain. If it is operated for the benefit of only the members of the white race, the Negroes may complain. Accordingly, the defendants are required to elect to operate on a non-discriminatory basis, or, if leased, to see that the park is operated by the lessee without discrimination. If, in the wisdom of the leaders of this Commonwealth, it is determined to close Seashore State Park, this is not a matter for determination by the Court. Nor is this Court passing upon the right to sell or lease this facility in *absolute good faith* by giving due notice of its intentions in such a manner that interested parties, regardless of race, may avail themselves of the equal opportunity afforded to submit bids with respect to same. Such a proposed sale or lease should, however, contain specific provisions as to all terms and conditions, and any attempt to "negotiate" a sale or lease will be carefully scrutinized by this Court should the matter be presented in due time. In short, the power to sell or lease must not include the power to discriminate against members of any race. Such a power exists in this case under the contemplated leasing. It will not be assumed that the General Assembly of Virginia, in granting discretion to the Board and the Director to prescribe the terms and conditions of any sale or lease, intended to sanction any discrimination as between the citizens of Virginia.

There are, undoubtedly, instances of occasional leasings of property owned by Federal, State or Municipal authorities, which are permitted even though admission is restricted. A lease of a public auditorium or other public facility to a *bona fide* and lawful private organization or individual for limited hours or days, and for express purposes, is legal although admission is limited to certain individuals or groups but, in such cases, the same right to lease must rest in any and all groups seeking such a lease.

The judgment of this Court is not rendered without the full realization of the impact of this decision on the State Park System in Virginia. The future course rests in the hands of the elected and appointed representatives of the Commonwealth. This opinion follows the law as set forth in all decided cases touching on the subject matter, and it is rather significant that no legal authority has been cited by the defendants to justify any other conclusion. The contention that a normal lessor-lessee relationship should be permitted in leases of public property must give way to the constitutional rights of the citizens as a whole.

A decree will be entered in the form of a declaratory judgment stating that plaintiffs' rights to use and enjoy the facilities at Seashore State Park have been violated under the Constitution of the United States, and a permanent injunction will be granted restraining the defendants from again denying any persons of the Negro race, by reason of their race and color, the right to use and enjoy the facilities at said Park. The injunction will contain a provision that if said Park or any part thereof is leased, the lease must not, directly or indirectly, operate so as to discriminate against the members of any race.