# BURTON *v.* WILMINGTON PARKING AUTHORITY ET AL.

No. 164. Argued February 21, 23, 1961.—Decided April 17, 1961.

716

*Louis L. Redding* argued the cause and filed a brief for appellant.

*Clair John Killoran* argued the cause and filed a brief for the Wilmington Parking Authority, appellee.

*Thomas Herlihy, Jr.* argued the cause and filed a brief for Eagle Coffee Shoppe, Inc., appellee.

*Solicitor General Cox* argued the cause for the United States, as *amicus curiae,* urging reversal. On the memorandum were former *Solicitor General Rankin* and *Assistant Attorney General Tyler.*

MR. JUSTICE CLARK delivered the opinion of the Court.

In this action for declaratory and injunctive relief it is admitted that the Eagle Coffee Shoppe, Inc., a restaurant located within an off-street automobile parking building in Wilmington, Delaware, has refused to serve appellant food or drink solely because he is a Negro. The parking building is owned and operated by the Wilmington Parking Authority, an agency of the State of Delaware, and the restaurant is the Authority's lessee. Appellant claims that such refusal abridges his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Supreme Court of Delaware has held that Eagle was acting in "a purely private capacity" under its lease; that its action was not that of the Authority and was not, therefore, state action within the contemplation of the prohibitions contained in that Amendment. It also held that under 24 Del. Code,

§ 1501,[1] Eagle was a restaurant, not an inn, and that as such it "is not required [under Delaware law] to serve any and all persons entering its place of business." —— Del. ——, ——, 157 A. 2d 894, 902 (1960). On appeal here from the judgment as having been based upon a statute construed unconstitutionally, we postponed consideration of the question of jurisdiction under 28 U. S. C. § 1257 (2) to the hearing on the merits. 364 U. S. 810. We agree with the respondents that the appeal should be dismissed and accordingly the motion to dismiss is granted. However, since the action of Eagle in excluding appellant raises an important constitutional question, the papers whereon the appeal was taken are treated as a petition for a writ of certiorari, 28 U. S. C. § 2103, and the writ is granted. 28 U. S. C. § 1257 (3). On the merits we have concluded that the exclusion of appellant under the circumstances shown to be present here was discriminatory state action in violation of the Equal Protection Clause of the Fourteenth Amendment.

The Authority was created by the City of Wilmington pursuant to 22 Del. Code, §§ 501–515. It is "a public body corporate and politic, exercising public powers of the State as an agency thereof." § 504. Its statutory purpose is to provide adequate parking facilities for the convenience of the public and thereby relieve the "parking crisis, which threatens the welfare of the community . . . ." § 501 (7), (8) and (9). To this end the

---

[1] The statute provides that: "No keeper of an inn, tavern, hotel, or restaurant, or other place of public entertainment or refreshment of travelers, guests, or customers shall be obliged, by law, to furnish entertainment or refreshment to persons whose reception or entertainment by him would be offensive to the major part of his customers, and would injure his business. As used in this section, 'customers' includes all who have occasion for entertainment or refreshment."

Authority is granted wide powers including that of constructing or acquiring by lease, purchase or condemnation, lands and facilities, and that of leasing "portions of any of its garage buildings or structures for commercial use by the lessee, where, in the opinion of the Authority, such leasing is necessary and feasible for the financing and operation of such facilities." § 504 (a). The Act provides that the rates and charges for its facilities must be reasonable and are to be determined exclusively by the Authority "for the purposes of providing for the payment of the expenses of the Authority, the construction, improvement, repair, maintenance, and operation of its facilities and properties, the payment of the principal of and interest on its obligations, and to fulfill the terms and provisions of any agreements made with the purchasers or holders of any such obligations or with the city." § 504 (b)(8). The Authority has no power to pledge the credit of the State of Delaware but may issue its own revenue bonds which are tax exempt. Any and all property owned or used by the Authority is likewise exempt from state taxation.

The first project undertaken by the Authority was the erection of a parking facility on Ninth Street in downtown Wilmington. The tract consisted of four parcels, all of which were acquired by negotiated purchases from private owners. Three were paid for in cash, borrowed from Equitable Security Trust Company, and the fourth, purchased from Diamond Ice and Coal Company, was paid for "partly in Revenue Bonds of the Authority and partly in cash [$934,000] donated by the City of Wilmington, pursuant to 22 Del. C. c. 5 . . . . Subsequently, the City of Wilmington gave the Authority $1,822,827.69 which sum the Authority applied to the redemption of the Revenue Bonds delivered to Diamond Ice & Coal Co. and to the repayment of the Equitable Security Trust Company loan."

Before it began actual construction of the facility, the Authority was advised by its retained experts that the anticipated revenue from the parking of cars and proceeds from sale of its bonds would not be sufficient to finance the construction costs of the facility. Moreover, the bonds were not expected to be marketable if payable solely out of parking revenues. To secure additional capital needed for its "debt-service" requirements, and thereby to make bond financing practicable, the Authority decided it was necessary to enter long-term leases with responsible tenants for commercial use of some of the space available in the projected "garage building." The public was invited to bid for these leases.

In April 1957 such a private lease, for 20 years and renewable for another 10 years, was made with Eagle Coffee Shoppe, Inc., for use as a "restaurant, dining room, banquet hall, cocktail lounge and bar and for no other use and purpose." The multi-level space of the building which was let to Eagle, although "within the exterior walls of the structure, has no marked public entrance leading from the parking portion of the facility into the restaurant proper . . . [whose main entrance] is located on Ninth Street." —— Del., at ——, 157 A. 2d, at 899. In its lease the Authority covenanted to complete construction expeditiously, including completion of "the decorative finishing of the leased premises and utilities therefor, without cost to Lessee," including necessary utility connections, toilets, hung acoustical tile and plaster ceilings; vinyl asbestos, ceramic tile and concrete floors; connecting stairs and wrought iron railings; and wood-floored show windows. Eagle spent some $220,000 to make the space suitable for its operation and, to the extent such improvements were so attached to realty as to become part thereof, Eagle to the same extent enjoys the Authority's tax exemption.

The Authority further agreed to furnish heat for Eagle's premises, gas service for the boiler room, and to make, at its own expense, all necessary structural repairs, all repairs to exterior surfaces except store fronts and any repairs caused by lessee's own act or neglect. The Authority retained the right to place any directional signs on the exterior of the let space which would not interfere with or obscure Eagle's display signs. Agreeing to pay an annual rental of $28,700, Eagle covenanted to "occupy and use the leased premises in accordance with all applicable laws, statutes, ordinances and rules and regulations of any federal, state or municipal authority." Its lease, however, contains no requirement that its restaurant services be made available to the general public on a nondiscriminatory basis, in spite of the fact that the Authority has power to adopt rules and regulations respecting the use of its facilities except any as would impair the security of its bondholders. § 511.

Other portions of the structure were leased to other tenants, including a bookstore, a retail jeweler, and a food store. Upon completion of the building, the Authority located at appropriate places thereon official signs indicating the public character of the building, and flew from mastheads on the roof both the state and national flags.

In August 1958 appellant parked his car in the building and walked around to enter the restaurant by its front door on Ninth Street. Having entered and sought service, he was refused it. Thereafter he filed this declaratory judgment action in the Court of Chancery. On motions for summary judgment, based on the pleadings and affidavits, the Chancellor concluded, contrary to the contentions of respondents, that whether in fact the lease was a "device" or was executed in good faith, it would not "serve to insulate the public authority from the force and effect of the Fourteenth Amendment." 150 A. 2d 197, 198. He found it not necessary, therefore, to pass upon

the rights of private restaurateurs under state common and statutory law, including 24 Del. Code § 1501. The Supreme Court of Delaware reversed, as we mentioned above, holding that Eagle "in the conduct of its business, is acting in a purely private capacity." It, therefore, denied appellant's claim under the Fourteenth Amendment. Upon reaching the application of state law, it held, contrary to appellant's assertion that Eagle maintained an inn, that Eagle's operation was "primarily a restaurant and thus subject to the provisions of 24 Del. C. § 1501, which does not compel the operator of a restaurant to give service to all persons seeking such." —— Del., at ——, 157 A. 2d, at 902. Delaware's highest court has thus denied the equal protection claim of the appellant as well as his state-law contention concerning the applicability of § 1501.

On the jurisdictional question, we agree that the judgment of Delaware's court does not depend for its ultimate support upon a determination of the constitutional validity of a state statute, but rather upon the holding that on the facts Eagle's racially discriminatory action was exercised in "a purely private capacity" and that it was, therefore, beyond the prohibitive scope of the Fourteenth Amendment.

The *Civil Rights Cases,* 109 U. S. 3 (1883), "embedded in our constitutional law" the principle "that the action inhibited by the first section [Equal Protection Clause] of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." Chief Justice Vinson in *Shelley* v. *Kraemer,* 334 U. S. 1, 13 (1948). It was language in the opinion in the *Civil Rights Cases, supra,* that phrased the broad test of state responsibility under the Fourteenth Amendment, predicting its consequence upon "State action of every kind . . . which denies . . .

the equal protection of the laws." At p. 11. And only two Terms ago, some 75 years later, the same concept of state responsibility was interpreted as necessarily following upon "state participation through any arrangement, management, funds or property." *Cooper* v. *Aaron, 358* U. S. 1, 4 (1958). It is clear, as it always has been since the *Civil Rights Cases, supra,* that "Individual invasion of individual rights is not the subject-matter of the amendment," at p. 11, and that private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it. Because the virtue of the right to equal protection of the laws could lie only in the breadth of its application, its constitutional assurance was reserved in terms whose imprecision was necessary if the right were to be enjoyed in the variety of individual-state relationships which the Amendment was designed to embrace. For the same reason, to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an "impossible task" which "This Court has never attempted." *Kotch* v. *Pilot Comm'rs,* 330 U. S. 552, 556. Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.

The trial court's disposal of the issues on summary judgment has resulted in a rather incomplete record, but the opinion of the Supreme Court as well as that of the Chancellor presents the facts in sufficient detail for us to determine the degree of state participation in Eagle's refusal to serve petitioner. In this connection the Delaware Supreme Court seems to have placed controlling emphasis on its conclusion, as to the accuracy of which there is doubt, that only some 15% of the total cost of the facility was "advanced" from public funds; that

the cost of the entire facility was allocated three-fifths to the space for commercial leasing and two-fifths to parking space; that anticipated revenue from parking was only some 30.5% of the total income, the balance of which was expected to be earned by the leasing; that the Authority had no original intent to place a restaurant in the building, it being only a happenstance resulting from the bidding; that Eagle expended considerable moneys on furnishings; that the restaurant's main and marked public entrance is on Ninth Street without any public entrance direct from the parking area; and that "the only connection Eagle has with the public facility . . . is the furnishing of the sum of $28,700 annually in the form of rent which is used by the Authority to defray a portion of the operating expense of an otherwise unprofitable enterprise." —— Del. ——, ——, 157 A. 2d 894, 901. While these factual considerations are indeed validly accountable aspects of the enterprise upon which the State has embarked, we cannot say that they lead inescapably to the conclusion that state action is not present. Their persuasiveness is diminished when evaluated in the context of other factors which must be acknowledged.

The land and building were publicly owned. As an entity, the building was dedicated to "public uses" in performance of the Authority's "essential governmental functions." 22 Del. Code, §§ 501, 514. The costs of land acquisition, construction, and maintenance are defrayed entirely from donations by the City of Wilmington, from loans and revenue bonds and from the proceeds of rentals and parking services out of which the loans and bonds were payable. Assuming that the distinction would be significant, cf. *Derrington* v. *Plummer,* 240 F. 2d 922, 925, the commercially leased areas were not surplus state property, but constituted a physically and financially integral and, indeed, indispensable part of the State's

plan to operate its project as a self-sustaining unit. Upkeep and maintenance of the building, including necessary repairs, were responsibilities of the Authority and were payable out of public funds. It cannot be doubted that the peculiar relationship of the restaurant to the parking facility in which it is located confers on each an incidental variety of mutual benefits. Guests of the restaurant are afforded a convenient place to park their automobiles, even if they cannot enter the restaurant directly from the parking area. Similarly, its convenience for diners may well provide additional demand for the Authority's parking facilities. Should any improvements effected in the leasehold by Eagle become part of the realty, there is no possibility of increased taxes being passed on to it since the fee is held by a tax-exempt government agency. Neither can it be ignored, especially in view of Eagle's affirmative allegation that for it to serve Negroes would injure its business, that profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency.

Addition of all these activities, obligations and responsibilities of the Authority, the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service, indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn. It is irony amounting to grave injustice that in one part of a single building, erected and maintained with public funds by an agency of the State to serve a public purpose, all persons have equal rights, while in another portion, also serving the public, a Negro is a second-class citizen, offensive because of his race, without rights and unentitled to service, but at the same time fully enjoys equal access to nearby restaurants in wholly

privately owned buildings. As the Chancellor pointed out, in its lease with Eagle the Authority could have affirmatively required Eagle to discharge the responsibilities under the Fourteenth Amendment imposed upon the private enterprise as a consequence of state participation. But no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be. It is of no consolation to an individual denied the equal protection of the laws that it was done in good faith. Certainly the conclusions drawn in similar cases by the various Courts of Appeals do not depend upon such a distinction.[2] By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.

Because readily applicable formulae may not be fashioned, the conclusions drawn from the facts and circumstances of this record are by no means declared as universal truths on the basis of which every state leasing agreement is to be tested. Owing to the very "largeness"

---

[2] See *Aaron* v. *Cooper*, 261 F. 2d 97 (C. A. 8th Cir.); *City of Greensboro* v. *Simkins*, 246 F. 2d 425 (C. A. 4th Cir.), affirming 149 F. Supp. 562 (D. C. M. D. N. C.); *Derrington* v. *Plummer*, 240 F. 2d 922 (C. A. 5th Cir.); *Coke* v. *City of Atlanta*, 184 F. Supp. 579 (D. C. N. D. Ga.); *Jones* v. *Marva Theatres*, 180 F. Supp. 49 (D. C. D. Md.); *Tate* v. *Department of Conservation*, 133 F. Supp. 53 (D. C. E. D. Va.), aff'd, 231 F. 2d 615 (C. A. 4th Cir.); *Nash* v. *Air Terminal Services*, 85 F. Supp. 545 (D. C. E. D. Va.); *Lawrence* v. *Hancock*, 76 F. Supp. 1004, (D. C. S. D. W. Va.); and see *Muir* v. *Louisville Park Theatrical Assn.*, 347 U. S. 971, vacating and remanding 202 F. 2d 275 (C. A. 6th Cir.).

of government, a multitude of relationships might appear to some to fall within the Amendment's embrace, but that, it must be remembered, can be determined only in the framework of the peculiar facts or circumstances present. Therefore respondents' prophecy of nigh universal application of a constitutional precept so peculiarly dependent for its invocation upon appropriate facts fails to take into account "Differences in circumstances [which] beget appropriate differences in law," *Whitney* v. *Tax Comm'n*, 309 U. S. 530, 542. Specifically defining the limits of our inquiry, what we hold today is that when a State leases public property in the manner and for the purpose shown to have been the case here, the proscriptions of the Fourteenth Amendment must be complied with by the lessee as certainly as though they were binding covenants written into the agreement itself.

The judgment of the Supreme Court of Delaware is reversed and the cause remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE STEWART, concurring.

I agree that the judgment must be reversed, but I reach that conclusion by a route much more direct than the one traveled by the Court. In upholding Eagle's right to deny service to the appellant solely because of his race, the Supreme Court of Delaware relied upon a statute of that State which permits the proprietor of a restaurant to refuse to serve "persons whose reception or entertainment by him would be offensive to the major part of his customers . . . ." * There is no suggestion in the record that the appellant as an individual was such a person. The highest court of Delaware has thus construed this

---

*24 Del. Code, § 1501. The complete text of the statute is set out in the Court opinion at note 1.

legislative enactment as authorizing discriminatory classification based exclusively on color. Such a law seems to me clearly violative of the Fourteenth Amendment. I think, therefore, that the appeal was properly taken, and that the statute, as authoritatively construed by the Supreme Court of Delaware, is constitutionally invalid.

MR. JUSTICE FRANKFURTER, dissenting.

According to my brother STEWART, the Supreme Court of Delaware has held that one of its statutes, 24 Del. Code, § 1501, sanctions a restaurateur denying service to a person solely because of his color. If my brother is correct in so reading the decision of the Delaware Supreme Court, his conclusion inevitably follows. For a State to place its authority behind discriminatory treatment based solely on color is indubitably a denial by a State of the equal protection of the laws, in violation of the Fourteenth Amendment. My brother HARLAN also would find the claim of invalidity of the statute decisive if he could read the state court's construction of it as our brother STEWART reads it. But for him the state court's view of its statute is so ambiguous that he deems it necessary to secure a clarification from the state court of how in fact it did construe the statute.

I certainly do not find the clarity that my brother STEWART finds in the views expressed by the Supreme Court of Delaware regarding 24 Del. Code, § 1501. If I were forced to construe that court's construction, I should find the balance of considerations leading to the opposite conclusion from his, namely, that it was merely declaratory of the common law and did not give state sanction to refusing service to a person merely because he is colored. The Court takes no position regarding the statutory meaning which divides my brothers HARLAN and STEWART. Clearly it does not take MR. JUSTICE STEWART'S view of what the Supreme Court of Delaware decided.

If it did, it would undoubtedly take his easy route to decision and not reach the same result by its much more circuitous route.

Since the pronouncement of the Supreme Court of Delaware thus lends itself to three views, none of which is patently irrational, why is not my brother HARLAN's suggestion for solving this conflict the most appropriate solution? Were we to be duly advised by the Supreme Court of Delaware that MR. JUSTICE STEWART is correct in his reading of what it said, there would be an easy end to our problem. There would be no need for resolving the problems in state-federal relations with which the Court's opinion deals. If, on the other hand, the Delaware court did not mean to give such an invalidating construction to its statute, we would be confronted with the problems which the Court now entertains for decision, unembarrassed by disregard of a simpler issue. This would involve some delay in adjudication. But the time would be well spent, because the Court would not be deciding serious questions of constitutional law any earlier than due regard for the appropriate process of constitutional adjudication requires.

Accordingly, I join in MR. JUSTICE HARLAN's proposed disposition of the case without intimating any view regarding the question, prematurely considered by the Court, as to what constitutes state action.

MR. JUSTICE HARLAN, whom MR. JUSTICE WHITTAKER joins, dissenting.

The Court's opinion, by a process of first undiscriminatingly throwing together various factual bits and pieces and then undermining the resulting structure by an equally vague disclaimer, seems to me to leave completely at sea just what it is in this record that satisfies the requirement of "state action."

I find it unnecessary, however, to inquire into the matter at this stage, for it seems to me apparent that before passing on the far-reaching constitutional questions that may, or may not, be lurking in this judgment, the case should first be sent back to the state court for clarification as to the precise basis of its decision.  In deciding this case the Delaware Supreme Court, among other things, said:

"It [Eagle] acts as a restaurant keeper and, as such, is not required to serve any and all persons entering its place of business, any more than the operator of a bookstore, barber shop, or other retail business is required to sell its product to every one.  This is the common law, and the law of Delaware as restated in 24 Del. C. § 1501 with respect to restaurant keepers.  10 Am. Jur., Civil Rights, §§ 21, 22; 52 Am. Jur., Theatres, § 9; Williams v. Howard Johnson's Restaurant, 4 cir., 268 F. 2d 845.  We, accordingly, hold that the operation of its restaurant by Eagle does not fall within the scope of the prohibitions of the Fourteenth Amendment." *  —— Del. ——, ——, 157 A. 2d 894, 902.

If in the context of this record this means, as my Brother Stewart suggests, that the Delaware court construed this state statute "as authorizing discriminatory classification based exclusively on color," I would certainly agree, without more, that the enactment is offensive to the Fourteenth Amendment.  It would then be quite

---

*24 Del. Code, § 1501, reads as follows:

"No keeper of an inn, tavern, hotel, or restaurant, or other place of public entertainment or refreshment of travelers, guests, or customers shall be obliged, by law, to furnish entertainment or refreshment to persons whose reception or entertainment by him would be offensive to the major part of his customers, and would injure his business."

unnecessary to reach the much broader questions dealt with in the Court's opinion. If, on the other hand, the state court meant no more than that under the statute, as at common law, Eagle was free to serve only those whom it pleased, then, and only then, would the question of "state action" be presented in full-blown form.

I think that sound principles of constitutional adjudication dictate that we should first ascertain the exact basis of this state judgment, and for that purpose I would either remand the case to the Delaware Supreme Court, see *Musser* v. *Utah,* 333 U. S. 95; cf. *Harrison* v. *N. A. A. C. P.,* 360 U. S. 167, or hold the case pending application to the state court for clarification. See *Herb* v. *Pitcairn,* 324 U. S. 117. It seems to me both unnecessary and unwise to reach issues of such broad constitutional significance as those now decided by the Court, before the necessity for deciding them has become apparent.