**William R. ADAMS et al.**

v.

**The CITY OF NEW ORLEANS, LOUISI-ANA, et al.**

**Civ. A. Nos. 10062, 10047.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Aug. 2, 1962.

---

428

A. P. Tureaud, A. M. Trudeau, Jr., Ernest N. Morial, New Orleans, La., Jack Greenberg, New York City (James M. Nabrit III, Michael Meltsner, New York City, of counsel), for plaintiff.

Alvin Liska, City Atty., Joseph M. Hurndon, Ernest L. Salatich, Asst. City Attys., Guste, Barnett & Little, Herman Barnett, Charles Schwartz, Jr., New Orleans, La., for Interstate Hosts.

Joseph Berrigan, New Orleans, La., for New Orleans Aviation Board.

CHRISTENBERRY, Chief Judge.

This matter is before the Court on plaintiffs' motion for a preliminary injunction to restrain the practice of segregation of races in certain restaurant, bar and lounge facilities at the Moisant International Airport. Opposition to the motion has been filed by defendants, The City of New Orleans, and its Mayor, O. L. Sands, the manager of the airport, the New Orleans Aviation Board, its chairman and members, and the Interstate Company, the lessee-operator of the facilities in question.

In 1957, the City of New Orleans and the New Orleans Aviation Board, an agency of the city charged with the maintenance and operation of the Moisant International Airport, undertook the construction of a new administration and terminal building for the airport, which was aided by a substantial loan from an agency of the federal government. The land on which the building was constructed and the building itself were and are now owned and maintained by the City and its Aviation Board.

On September 30, 1957, pursuant to an ordinance passed by the New Orleans City Council, the City, after receiving public bids, entered into a lease agreement with a Delaware corporation styled Interstate Company, and also known as Interstate Hosts, Inc., whereby the latter received an exclusive franchise to operate and maintain restaurant concessions, bars and other facilities serving food and beverages at the airport. The lease agreement provided for rental payment to the City based on a percentage of gross receipts from the operation of the facilities, with a guaranteed minimum of $5,756,300.00 over a period of fourteen years. The City reserved the right to review and correct deficiencies in the quality and quantity of products served, and to reduce prices if they were found to be not in accord with those in effect at comparable restaurants and cocktail lounges in the City of New Orleans. In addition, the lease provides that Interstate discharge any employee deemed undesirable by the Aviation Board.

At present, Interstate Hosts operates facilities at the airport known as the Snack Bar, the Coffee Shop, Le Bar, the International Room, a restaurant, and the Cocktail Lounge, which adjoins the International Room. Only the Snack Bar and the Coffee Shop are operated on a de-segregated basis, the others not being available to members of the Negro race.

Plaintiffs now request a preliminary injunction to restrain discriminatory conduct on the part of defendants. Plaintiffs claim that the refusal to serve them, based solely on considerations of race, constitutes "state action", which deprives them of "Equal Protection" guaranteed

by the Fourteenth Amendment to the United States Constitution.

Defendants counter plaintiffs' claim with the following expressed defenses: 1) that Interstate Hosts is a purely private enterprise and is in no way controlled or supervised by the City of New Orleans or the New Orleans Aviation Board in the selection of patrons, service or operation of facilities; 2) that the facilities operated by Interstate Hosts on a segregated basis are located on "surplus" city property, improved by Interstate at a cost of over $963,000.00; 3) that the Snack Bar and Coffee Shop serve food and drink on a de-segregated basis within the airport complex; 4) that the presently segregated facilities are "luxury type" facilities catering to a specialized clientele, and finally 5) that in the event an injunction be granted, the use of the facilities by Negroes would be "infinitesimal", and yet Interstate Hosts would suffer severe financial loss in the operation of its business.

The decisive question presented here is whether or not the action of the lessee, Interstate Hosts, may, in the constitutional view, be said to be the conduct of the City of New Orleans, constituting "state action". I find that it is.

In Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the defendant was an agency of the State of Delaware charged with the responsibility of providing parking facilities for the convenience of the public. The Authority undertook the project of constructing a parking facility in Wilmington which included a "garage building" containing space for restaurant facilities. This area was leased to Eagle Coffee Shoppe, Inc., a concessionaire, for use as a "restaurant, dining room, banquet hall, cocktail lounge and bar * * *." Eagle spent some $220,000.00 in physical improvement of the premises, and agreed to pay an annual rental of $28,700.00 In that case, the defendants raised several defenses identical to those urged here. In disposing of these defenses and in granting injunctive relief to plaintiff, the Court had this to say (at pp. 724–725, 81 S.Ct. at p. 861):

"Neither can it be ignored, especially in view of Eagle's affirmative allegation that for it to serve Negroes would injure its business, that profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency.

"Addition of all these activities, obligations and responsibilities of the Authority, the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service, indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn. It is irony amounting to grave injustice that in one part of a single building, erected and maintained with public funds by an agency of the State to serve a public purpose, all persons have equal rights, while in another portion, also serving the public, a Negro is a second-class citizen, offensive because of his race, without rights and unentitled to service, but at the same time fully enjoys equal access to nearby restaurants in wholly privately owned buildings. As the Chancellor pointed out, in its lease with Eagle the Authority could have affirmatively required Eagle to discharge the responsibilities under the Fourteenth Amendment imposed upon the private enterprise as a consequence of state participation. But no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be. It is of no consolation to an individual denied the equal protection of the laws that it was done in good faith. Certainly the conclusions drawn in similar cases by the various Courts of Appeals do not depend on such a distinction. (Au-

thorities noted). By its inaction, the Authority, and through it the State has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment."

The Court stated further (at p. 726, 81 S.Ct. at p. 862):

"Specifically defining the limits of our inquiry, what we hold today is that when a State leases public property in the manner and for the purposes shown to have been the case here, the proscriptions of the Fourteenth Amendment must be complied with by the lessee as certainly as though they were binding covenants written into the agreement itself."

The principle finally established in Burton, supra, and reaffirmed in Turner v. City of Memphis, 369 U.S. 350, 82 S. Ct. 805, 7 L.Ed.2d 762 (1962), was confirmatory of the reasons for similar holdings in Derrington v. Plummer, 240 F.2d 922 (5th Cir., 1956), cert. denied 353 U.S. 924, 77 S.Ct. 680, 1 L.Ed.2d 719 (leased cafeteria in courthouse); City of Greensboro v. Simkins, 246 F.2d 425 (4th Cir., 1957) affirming 149 F.Supp. 562 (M.D.N.C., 1957) (leased golf course); Coke v. City of Atlanta, 184 F. Supp. 579 (N.D.Ga., 1960) (leased restaurant in airport). These authorities leave little doubt that plaintiffs in the case before this Court are entitled to injunctive relief as a matter of law.

In dealing with the equitable defenses argued by defendants, namely that only a few Negroes will exercise their rights and that such exercise will cause them disproportionate financial loss, we cite McCabe v. Atchison, Topeka and Santa Fe Ry. Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169 (1914), which denied the merit of an identical defense stating that such an argument "makes the constitutional right depend upon the number of persons who may be discriminated against, whereas the essence of the constitutional right is that it is a personal one." When there is found to be unconstitutional "state action" depriving a person of "Equal Protection", it has been held squarely that financial loss cannot justify the illegal action. City of St. Petersburg v. Alsup, 238 F.2d 830, 832 (5th Cir., 1956), cert. denied 353 U. S. 922, 77 S.Ct. 680, 1 L.Ed.2d 719.

In this case, the City of New Orleans, a subdivision of the State of Louisiana, owns, and, through its Aviation Board, operates the Moisant International Airport as an undeniably legitimate governmental function for the benefit of the public. It has seen fit to lease its property and stands to derive therefrom an average annual minimum rental in a sum in excess of $400,000.00. The rental, based on percentage of gross receipts, the right of the City to control the quantity and quality of the products served, to reduce prices and to have employees dismissed, coupled with the primary fact of city ownership of the property place this case so firmly within the purview of Burton, that, even recognizing the warning in Burton that its "conclusions * * * are by no means declared as universal truths on the basis of which every state leasing agreement is to be tested", this Court is constrained to find the holding of that case to be controlling.

Accordingly, plaintiffs' motion for a preliminary injunction will be granted. The parties will have five days within which to submit proposed form of preliminary injunction.