PATTIE A. CLAY INFIRMARY ASSOCI-
ATION; Alice Jane Tribble, Chairman
of the Pattie A. Clay Infirmary Associa-
tion; Mrs. Ray Salyer, Secretary of the
Pattie A. Clay Infirmary Association;
Pattie A. Clay Hospital; Mrs. Earl B.
Combs, Chairman of the Pattie A. Clay
Hospital Board of Directors; and Mrs.
George C. Robbins, Secretary of the
Pattie A. Clay Hospital Board of Di-
rectors, Appellants,

v.

FIRST PRESBYTERIAN CHURCH OF
RICHMOND, Kentucky; and G. Murray
Smith, Jr., Individually and as the Duly
Elected Director to the Pattie A. Clay
Hospital Board of Directors for the
First Presbyterian Church of Richmond,
Kentucky, Appellees.

Court of Appeals of Kentucky.

Sept. 5, 1980.

Alison Lobb Milby, Walker & Milby, Richmond, for appellants.

Phillip D. Scott, Paul R. Collins, Greenebaum, Doll & McDonald, Lexington, for appellees.

Before HAYES, C. J., and WHITE and REYNOLDS, JJ.

WHITE, Judge.

This appeal arises from the Corrected Judgment of the Madison Circuit Court by which it was ordered that the male nominee, and any male successor thereto, of the First Presbyterian Church of Richmond be seated as director of the Pattie A. Clay Infirmary Association.

The appellant Association was founded in 1892 for the purpose of establishing and operating a health–care facility in Richmond. Real estate for this purpose was conveyed by Brutus J. Clay with the stipulation that the Board carry representation from each of the white Protestant churches of Richmond. The bylaws of the Infirmary further defined the Board's composition by requiring that:

> The Board of Directors shall consist of *twelve women,* members of the Association; one of whom shall be elected on the recommendation of each of the seven white churches in Richmond, Ky., and the Association shall select the five remaining ones. (Emphasis added.)

The Board's authority includes the appointment of an active Board of Trustees for the Infirmary, which Board recognizes no gender limitation.

In 1972 the First Presbyterian Church of Richmond challenged the restriction on its right of appointment by electing a male as its representative. Following the Association's refusal to seat the Church's choice, appellees sought a Declaratory Judgment to resolve whether the Fourteenth Amendment to the Federal Constitution and Section Two of the Kentucky Constitution, relating to equal protection and equal rights, were violated by the Association's prohibition.

The circuit court, finding that the Infirmary "is operated for the benefit of the general public in Madison County and has a public purpose," held in favor of the Church and its male nominee. On appeal, however, the case was reversed and remanded

> ... with directions that further proof be taken on the issue of whether the actions of the hospital in refusing to seat Smith on its Board of Directors are under color of state law. If such state action is found, the membership restriction according to sex should be declared void. Conversely, if the actions of the Association are found private in nature, no constitutional violation can be found and the action should be dismissed.

Appellee Church thereby initiated a lengthy process of discovery by which significant interactions with local, state, and federal governments were sought to be established. Several factors were revealed:

A temporary Lessor–Lessee relationship exists with the City by which the hospital is to lease an industrial building to be erected with funds derived from the issuance of revenue bonds. Payments against the bonds, sufficient to cover principal, interest, and maintenance, are to be met through rental fees from the hospital rather than from general City funds. The City is to hold title to the hospital facility until the bonds have been fully retired. The agreement was reached between the City and the hospital based on a recognition of the City's

duty to promote the general welfare and public health of its constituency. Clay Infirmary is the only hospital within the City's limits although a second facility exists within Madison County.

In 1967 the land on which the Infirmary is located was purchased from the Commonwealth under a twenty–year agreement. The terms of the sale include a provision reconveying the entire facility, land and improvements, to the state, at a fair price, should the project ever be abandoned. Also, the hospital is permitted to meet a portion of its rent obligations through providing medical services to the students of Eastern Kentucky University.

As a nonprofit corporation, the hospital is exempt from the taxing aspect of federal and state governments; nevertheless, based upon the nature of its work, it is subject to contact with the state through extensive regulatory controls relating primarily to licensing.

Finally, it was established that federal Medicaid and Medicare funds provide approximately thirty–eight (38%) per cent of the hospital's revenues. In addition sources of construction funds include grants under the federally sponsored Hill–Burton program and Appalachian Regional Commission.

Subsequent to discovery appellees moved for a Summary Judgment, in response to which either side filed memoranda. In denying the Summary Judgment, the circuit court found that the "Association is a private entity without sufficient connection between it and the state for its actions to be considered state action." However, in contradiction with this denial and finding and thus in contravention of the instruction on remand, an Order was entered requiring that the Church's male nominee be seated.

Noting the inconsistency between the findings of fact, conclusions of law, and the Order, appellants moved to alter that Judgment. The court subsequently entered a brief Corrected Judgment by which the previous Judgment was acknowledged as incorrect, the Church's motion for a Summary Judgment was sustained, and the Infirmary was again required to seat as Director the male nominee and any male successor chosen by the First Presbyterian Church of Richmond.

On appeal appellants assert that having found in its initial judgment that the hospital was a private entity, the circuit court erred in mandating through the Corrected Judgment the seating of the male director without findings to the contrary. Further, appellants urge that an examination of the discovery evidence in view of applicable case law does not establish factors sufficient to require recognition of the state action necessary to compel the alteration of the Board's traditional structure.

Implicit in appellants' first argument is the theory that having issued specific findings of fact in the initial judgment, the court is controlled by them until they are preempted by the entry of new and contrary ones. We disagree based on well–established considerations.

█ A Corrected Judgment stands alone. Unless it clearly is evident otherwise, its effect is not merely to complement the previous judgment but rather to serve alone as the entire disposition of the case. CR 52 grants to the court the unlimited power to alter its judgment. When that authority is exercised, the slate is wiped clean, thereby removing any force the earlier judgment may have carried. The court becomes free to enter a separate and independent judgment governed, as was the first, by the Rules of Civil Procedure.

█ Herein, although the court chose to attach findings of fact and conclusions of law to the first judgment, there was no procedural requirement for such. The court's action was in response to appellees' motion under CR 56 for a Summary Judgment, for which a simple yea or nay is sufficient explanation. Given the confusion surrounding the inconsistency of the first judgment, the better course would have been to have included also in the second some informative commentary; however, we are unable to state as a matter of law that it was error not to have done so.

Having considered the procedural aspects, this Court is next required to review whether substantively the entry of a Summary Judgment in favor of appellees was correct.

█ Private conduct bears no relationship to equal protection standards. In order for a constitutional shield to be offered, therefore, it is necessary to determine whether state action has been sufficiently established, *i. e.* "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Company*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974).

Such may be determined in a variety of ways, *e. g.* through the state's permitting private parties to perform functions traditionally the exclusive responsibilities of government or by creating a climate which encourages discriminatory policies.

Appellees' argument in support of the Summary Judgment is hinged upon the concept of a "symbiotic relationship" between the Infirmary and government, that through the *combined* effect of many sources of governmental support and involvement, each with unpersuasive individual effect, the state may be held responsible for the challenged activity. This idea was propounded in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), which involved a privately owned restaurant located within a publicly owned parking building. In finding state action the Court therein noted that the "peculiar relationship of the restaurant to the parking facility in which it is located confers on each an incidental variety of mutual benefits," such as providing convenient parking for diners which in turn could be a factor in increased profits for the parking building. The restaurant alleged that to be required to serve blacks would decrease its revenues; therefore, by converse logic the Court reasoned that the restaurant's profits from discrimination "not only contribute to, but also are indispensable elements in, the financial success of a gov-ernmental agency." 365 U.S. 724, 81 S.Ct. 861. Thus, through the interdependent relationship, the state in effect became a joint participant in the coffee shop's venture.

█ Herein, the profits or losses of the hospital in no way relate to any alleged discrimination to be found in the Board's composition; much less are such revenues to be deemed an indispensable element in the financial success of a governmental agency.

Neither state nor federal cases have created a precise formula of factors to be evaluated in developing the requisite connection between government and the challenged activity. From a compilation of case law, however, it is evident that such must involve a review of the totality of the circumstances rather than a search for any single controlling element. The Court in *Burton* recognized that its holding was "by no means declared as universal truths on the basis of which every state leasing agreement is to be tested." Rather, it was specifically limited to instances in which a "[s]tate leases public property in the manner and for the purposes shown to have been the case here." 365 U.S. 725, 726, 81 S.Ct. 862.

Appellees concede that a *Burton*esque symbiotic relationship is not to be "established as a matter of law solely on the basis of licensing regulations and partial federal funding. *See, e. g., Jackson v. Norton Children's Hospital*, 487 F.2d 502 (6th Cir., 1973)." They seek instead to bolster these factors with the presence of other elements which when viewed in sum are to reveal the necessary interaction. In considering *Burton*'s application to the present case, it is to be noted that it dealt with a charge of racial discrimination, conduct requiring less indicia of state participation than that of bias based on gender, an area demanding as yet only minimal constitutional inquiry.

Appellees seek support from the fact that the land was conveyed to the Infirmary by the Commonwealth and EKU with restrictions requiring its use as a medical facility and with a right of reverter should that use

not be continued. Cited is *Eaton v. Grubbs*, 329 F.2d 710 (4th Cir., 1964), in which a similar right of reverter was recognized as the basis for state action. The distinction to be found between that instance and our present case is that in *Eaton* the reverter was automatic and complete. Herein, although the reversion is to occur upon the happening of given circumstances, it requires also that the Infirmary be recompensed based on fair market value. In *Eaton* the state's sway was absolute; should reversion develop, the hospital would be entirely stripped of its property. Such clearly reveals the mighty impact of state action.

Under our facts the reversion serves not in the manner of a sharp punishment but rather as the exercise of an option in a business transaction: upon the occurrence of certain circumstances property is to be exchanged for money. The Clay Infirmary would clearly be left with more than a corporate shell. Although indicative of state *interest* in the hospital, such is too attenuated to be considered as determinative of state *action*.

Appellees look next to the relationship between Eastern Kentucky University and the hospital. The argument is presented that a core of mutual benefits is to be found in that by having medical services provided for its students, the University is relieved of the expense of establishing its own facilities whereas the hospital is benefitted through the offset granted in its rent. Again we must view this in terms of a business arrangement. EKU simply became the third–party beneficiary of the contracted terms of payment between the Commonwealth and the Infirmary. To rely upon this as the basis of an interaction or mutuality of benefits sufficient to support state action is misplaced confidence.

Finally, it has been asserted that the association between the City of Richmond and the Infirmary is the basis of a symbiotic relationship. *Ladt v. County of McCracken*, Ky.App., 555 S.W.2d 620 (1977), noted that through amending KRS Chapter 103 to include hospitals within the favored category of "industrial buildings," the General Assembly acknowledged the positive economic impact a hospital has on a community through, *e. g.*, its employment opportunities. To develop their symbiotic relationship theory, appellees have attempted to connect that benefit to the City with the benefit transferred to the hospital via the advantageous financial arrangements for expansion.

The City used its powers to issue bonds, the revenue from which is directed to an expansion program for the Infirmary and which the Infirmary is to repay through twenty annual payments. KRS 103.230(2) clearly establishes that repayment is to come solely from rental and does not constitute an obligation of the City. During the repayment period title is transferred to the City at the end of which time it is to be repurchased by the Infirmary in consideration of not more than one dollar ($1.00). The entire transaction is cast in terms of a Lessor–Lessee arrangement, which appellees aver is a mutually beneficial relationship sufficient to sustain their cause.

We fail to find the intent for a standard Lessor–Lessee relationship. Rather than a conventional leasing arrangement, the Infirmary has transferred its property to the City in the manner of collateralizing an expansion loan; such is but a legal fiction transacted to permit application of the statutorily beneficial terms of industrial development under KRS 103. The structure of that Chapter envisages the governmental unit's acquiring property, issuing revenue bonds for expansion, repaying the revenue bonds through rental income, and retaining ownership as a source of future income. Clearly state action is a *continuing* factor in such a situation. Herein, however, such was contractually modified to permit title to revert to private ownership after twenty years: state participation in the venture is marked by a *finite* characteristic, continuing only during the life of the bonds. Although the City remains contractually the creditor of the hospital, there is no day–to–day role for it to play in the business affairs of the Infirmary. Such is not scripted un-

less the hospital reneges on its obligation, at which time the City may petition for the appointment of a receiver to administer the facility for its benefit. KRS 103.250(2). Under the circumstances before us, we fail to find that the lease alone is sufficient to convert an otherwise private operation into one imbued with the color of state action.

A careful examination of the record and consideration of the applicable case law and theories presented require the conclusion that a relationship suitable for a finding of state action is not present between local, state, or federal governments and the Pattie A. Clay Infirmary. For that reason the Summary Judgment granted appellees is reversed and remanded with direction to enter an Order dismissing the action for failure to have established a constitutional violation.

All concur.