Scileppi, J. (dissenting).
This appeal raises the question of whether the petitioners, as tenants in the State Capital Grants Program, can be found ineligible for continued participation in that program and, on that basis, evicted as holdovers upon termination of their lease, without being apprised of the reasons for such or afforded an opportunity to reply. As these rights have been held to obtain in public housing situations (see Matter of Vinson v. Greenburgh Housing Auth., 29 A D 2d 338, affd. 27 N Y 2d 675), our inquiry is confined to determining whether the action taken may, as in public housing situations, properly be characterized as ‘ ‘ State action ’ ’ within the meaning of the Fourteenth Amendment, and hence whether the standards of due process apply.
It has long been imbedded in our constitutional law that the action inhibited by the Fourteenth Amendment is only such action as may properly be deemed that of the State (Burton v. Wilmington Parking Auth., 365 U. S. 715; Shelley v. Kraemer, 334 U. S. 1). Accordingly, private invasions of individual rights are not protected against, “unless to some significant extent the State in any of its manifestations has been found to have become involved in it. * * * Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance ” *320 (Burton v. Wilmington Parking Auth., 365 U. S. 715, 722, supra).
On January 29, 1965 the New York State Housing Finance Agency (the Agency), styling itself a “ corporate governmental agency constituting a public benefit corporation, ’ ’ leased a number of apartments from Field Housing Co., Inc., a limited-profit housing corporation organized under article II of the Private Housing Finance Law. In so leasing these units, the State Finance Agency acted pursuant to section 44-a of the Private Housing Finance Law which authorizes the Agency to lease up to 20% of the apartments in any limited-housing company project, or 50% if “unusually difficult housing conditions exist ”. The rent, to be paid by the Agency, is the standard rent less an extra deduction for an additional tax exemption granted. The Agency then sublets the apartment at a rent equal to 20% of the sublessee’s or tenant’s probable income. The prospective tenant is not eligible if his income exceeds by five times the regularly established rental.
The expense of the subsidy necessary (the difference between the established rental and that actually received from the occupant) is borne by the State through legislative appropriations, called the “ low rent lease account ”. The commissioner, pursuant to section 55 of the Private Housing Finance Law, operates the program as agent for the Agency, which is primarily a financing institution (see Quirk and Wein, Homeownership for the Poor: Tenant Condominiums, The Housing and Urban Development Act of 1968, and the Rockefeller Program, 54 Corn. L. Rev. 811, 859-860).
Pursuant to the lease with Field, and for the purpose of subleasing the apartment in accordance with section 44-a (subd. 2) of the Private Housing Finance Law, the Agency entered into an agreement with Mr. and Mrs. Melvin Fuller, petitioners herein, to lease one of the program apartments at a rental lower than the Agency paid. That lease was to run for a period of three years or to June 30, 1969, without the right to renew. Prior to the expiration of the lease, over 60 days before its end, the petitioners were informed that their lease would not be renewed. This action had been requested by the manager of the project and concurred in by respondent’s supervisor of the Low Rent Assistance Unit.
*321 When petitioners failed to vacate their apartment at the end of the lease term, a holdover eviction proceeding was commenced by the Division of Housing and Community Renewal, as agent of the Agency. This was terminated on July 31, 1969 for a technical defect not in issue. Petitioners then served an article 78 petition against respondent to annul his determination not to continue petitioners’ occupancy. It was dismissed on October 29, 1969 as no eviction proceeding was pending at that time. A second eviction proceeding was commenced on November 3, 1969. Petitioners thereupon commenced the instant article 78 proceeding, by order to show cause dated November 14, 1969. The answer of the respondent commissioner denied any arbitrary action and set forth a counterclaim for' reasonable use and occupation of petitioners’ apartment because they had not paid anything since the sublease expired. The respondent demanded on the counterclaim $203.50 per month, the amount of the unsubsidized rent. The petition and counterclaim was heard before the Special Term (Feiden, J.). On December 31, 1969 (corrected decision, January 15, 1970) the court ruled in favor of the respondent, holding that the nature of the petitioners’ tenancy was predominately private rather than public, and they could be evicted without cause and without a hearing. The court further held that the purpose of the program was to promote private investment and that it would be inequitable for subsidized tenants to receive a hearing when their unsubsidized neighbors could be evicted summarily. (61 Mise 2d 988.) The petitioners were found in default on the counterclaim and the matter was severed and set down for assessment.
Petitioners filed notice of appeal and the Appellate Division, Second Department, by intermediate order stayed all further proceedings in the Civil Court, and permitted the assessment of damages on the counterclaim, but limited execution thereon to petitioners’ unsubsidized rental, pending the appeal.
On appeal, the Appellate Division, one Justice dissenting, affirmed without opinion. Justice Benjamin in dissent maintained that under Vinson v. Greenburgh Housing Auth., (29 A D 2d 338, affd. 27 N Y 2d 675, supra) the State could not arbitrarily evict the petitioners but rather had to accord them treatment meeting “ the requirements of due process” by *322 giving them “ notice of its reasons for the proposed eviction ”.[1]
The Capital Grants Program, termed an imaginative attempt to improve traditional techniques of low-rent housing (Powlédge, New York State’s Capital Grant Program, Citizens’ Housing and Planning Council of New York, p. 7), authorizes subleases to low-income tenants at a rental (a) not less than $15 per room per month or the rent of ‘ ‘ comparable dwellings in new state-aided public housing projects in the community,” and (b) not more than 20% of the tenant’s probable annual income (Private Housing Finance Law, § 44-a subd. 2). The difference between the standard middle-income rental and the rent paid by the low-income tenant to the State is made in two stages. First, the State agency pays the Mitchell-Lama project less than the normal rent for comparable apartments, and instead provides the project with an additional tax exemption in respect to the program apartment. Second, the State agency receives a direct grant of State funds to make up the difference between what it pays the project and what it receives from its tenant (Private Housing Finance Law, §§ 44-a, 33, subd 2). In the present case, the standard rent of the petitioners’ apartment in Field Housing is $203.50 per month. The additional tax abatement attributed to the apartment brought the State’s “rent” to $175.31 per month (the amount paid by the State agency to Field), and the State subsidy provided the difference between that figure and the amount paid by the petitioners, $133.68 per month. The middle-income developments are constructed and managed at moderate cost because the State, pursuant to article II of the Private Housing Finance Law, mortgages the project by issuing low-interest, tax-free bonds to the public and grants the project substantial tax abatements. The developments are required to limit their profits and to submit to close State supervision.
Each lease between the State and a project must be approved by the respondent and is subject to the project’s mortgage *323 agreement (Private Housing Finance Law, § 44-a). The respondent or his agents also approve or disapprove the application of each prospective low-income tenant, and he or his agents make the final decision whether a low-income tenant is eligible for continued participation in the program.
In this case, the petitioners were informed by a representative in respondent’s Low-Rent Assistance Bureau that they had ‘ ‘ been found to be ineligible for occupancy under the Program ’ ’, and that their tenancy had been terminated. The division, as agent for the Agency, also brought summary proceedings against the petitioners in Civil Court.
It would seem settled law in this State that a public housing authority cannot adjudge its tenants ineligible and evict them without at least informing them of the reasons for their ineligibility and affording them an opportunity to reply (Matter of Vinson v. Greenburgh Housing Auth., 29 A D 2d 338, affd. 27 N Y 2d 675, supra; see, also, Goldberg v. Kelly, 397 U. S. 254; Thorpe v. Housing Auth., 393 U. S. 268; Caulder v. Durham Housing Auth., 433 F. 2d 998, cert. den. 401 U. S. 1003). Equating low-rent housing with public housing, petitioners argue that there is sufficient indicia of State action to require that the subtenants of the State in the Capital Grants Program must receive the same due process treatment mandated for the tenants in public housing. Considering the purposes of the program, I disagree and would affirm the order of the Appellate Division.
Within the framework of private enterprise the State has established the Capital Grants Program as a supplement to the often cumbersome traditional public housing program. Admittedly a hybrid, the program merely provides a vehicle whereby low-income families may be placed in private middle-income housing. Its purpose is threefold: to permit low-income housing to be undertaken in co-operation with private enterprise ; to eliminate the economic and racial stratification attending public housing projects; and to facilitate the movement of low-income families into middle-income housing by subsidy (see, Public Papers of Governor Rockefeller [1964], pp. 130-132). Manifestly, the program seeks to avoid the expense attending public housing programs while encouraging private investment in housing. Indeed, unlike public housing these units were not *324 built with public funds but were conceived, organized and constructed under the provisions of the New York State Private Housing Finance Law. As the legislative findings and purposes indicate, the program was not “ dedicated to ‘ public uses ’ in performance of * * * ‘ essential governmental functions ’ ” (Burton v. Wilmington Parking Auth., 365 U. S. 715, 723, supra), but rather seeks to provide adequate housing by encouraging private investment (see Private Housing Finance Law, § 41).
Subsidization, although involving some form of State assistance, does not alter the fact that the program contemplates only the investment of private capital to aid in the resolution of the current housing problem. Surely, the State is not in the constitutional sense, entering into the private sector to rectify social ills. Instead it seeks to encourage the private sector, marshalling all available resources as it were, to assume its share of the burden. As such, the program is a real expression of State deference to private enterprise and its efforts should not be impeded by grafting upon it, gratuitously, those obligations which are rightfully limited to instances of State action. As Special Term noted, [1] ‘ The State has not here embarked into an area of housing as a function of government ” (61 Mise 2d 991). This is the factor which distinguishes the present case from situations such as Vinson and Thorpe, where the standards of due process certainly apply.
The arguments set forth by the petitioners herein are not without current support (see McQueen v. Druker, 317 F. Supp. 1122). I disagree, however, that because the Mitchell-Lama project has been financed in part, by State funds, and the managing corporation, Field Housing, is the recipient of certain tax exemptions granted by the State, or because the daily operations are ultimately supervised by the Commissioner of Housing and Community Renewal, pursuant to the lease agreement, that there exists sufficient government participation and involvement so as to warrant the application of procedural due process. The purposes of the program, somewhat akin to those of the Federal Housing Act, are clearly to foster private investment and we have not yet reached the point where every form of governmental assistance is to be equated with ‘ ‘ State action ’ ’.
*325 Accordingly, the order of the Appellate Division should he affirmed.
Chief Judge Fuld and Judges Jasen and Gibson concur with Judge Breitel ; Judge Scileppi dissents and votes to affirm in a separate opinion in which Judges Burke and Bergan concur.
Order reversed, with costs, and case remitted to Special Term for further proceedings in accordance with the opinion herein.

. Subsequent to the decision of the Appellate Division, the Supreme Court, decided the counterclaim for use and occupancy, and concluded that in cases such as this the tenant appeals at his peril. Petitioners were held liable for the unsubsidized rent of the apartment for each month since July, 1969. This counterclaim was, however, severed from the main action and is not at issue on the appeal to .this court.