**TRIBUNE PUBLISHING COMPANY, a corporation, d/b/a Columbia Daily Tribune, Respondent,**

v.

**The CURATORS OF the UNIVERSITY OF MISSOURI, a public corporation, James C. Olson, and Herbert W. Schooling, Appellants.**

No. WD 33756.

Missouri Court of Appeals, Western District.

Sept. 27, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Nov. 29, 1983.

Application to Transfer Denied Jan. 17, 1984.

Robert L. Ross, Jackson A. Wright, James S. Newberry, Ted D. Ayres, Columbia, for appellants.

Terence C. Porter, Columbia, for respondent.

Before SOMERVILLE, J.P. and TURNAGE and LOWENSTEIN, JJ.

SOMERVILLE, Judge Presiding.

On February 22, 1978, Tribune Publishing Company, a corporation, d/b/a Columbia Daily Tribune (Tribune), filed its petition for declaratory judgment and injunctive relief in the Circuit Court of Boone County, Missouri, naming The Curators of the University of Missouri, a public corporation (singularly referred to as University), James C. Olson (singularly referred to as President Olson) and Herbert W. Schooling (singularly referred to as Chancellor Schooling)[1] as defendants (collectively referred to

1. Chancellor Schooling retired before the judgment and decree were entered. Dr. Barbara Uehling, present Chancellor of the University of Missouri-Columbia, was never substituted as a party in his place.

as appellants). Tribune's petition was predicated on §§ 610.010, 610.015, 610.020, 610.025 and 610.030, RSMo Supp.1975, as amended RSMo Supp.1977, colloquially known as the "Sunshine Law".[2]

Section 610.010(2) defines "Public governmental body" as follows: " 'Public governmental body', any constitutional or statutory governmental entity, including any state body, agency, board, bureau, commission, committee, department, division, or any political subdivision of the state, of any county or of any municipal government, school district or special purpose district, and any other governmental deliberative body under the direction of three or more elected or appointed members having rulemaking or quasi-judicial power."

Section 610.010(3) defines "Public meeting" as follows: " 'Public meeting', any meeting, formal or informal, regular or special, of *any public governmental body,* at which any public business is discussed, decided or public policy formulated." (emphasis added) Section 610.010(4) defines "Public record" as follows: " 'Public record', any record retained by or of *any public governmental body;* provided, however, that personally identifiable student records maintained by public educational institutions shall only be open for inspection by the parents, guardian or other custodian of students under the age of eighteen years and by the parents, guardian or other custodian and the student if the student is over the age of eighteen years." (emphasis added)

Section 610.015 provides, inter alia, as follows: " ... all public meetings shall be open to the public and public votes and public records shall be open to the public for inspection and duplication." Section 610.020 spells out certain notice requirements of meetings of public governmental bodies.

Section 610.025 authorizes closed meetings by and closed records of public governmental bodies in five designated instances, none of which are applicable under the allegations in Tribune's petition. Section 610.030 provides, inter alia, as follows: "The circuit courts of this state shall have the jurisdiction to issue injunctions to enforce the provisions of sections 610.010 to 610.030 ...."

Before proceeding further this court observes that the appeal sub judice arrives in a very confusing posture. One of the more glaring aspects being that Tribune at one point alleged in its petition that "defendant, 'The Curators of the University of Missouri' ", was the "governing body" of the University, which allegation was denied in the respective answers filed by defendants. The Tribune at another point alleged in its petition "[t]hat the defendant, 'The Curators of the University of Missouri', consists of a Board of Curators composed of nine (9) members appointed by the Governor of the State of Missouri and confirmed by the Senate of the State of Missouri", which allegation was admitted in the respective answers filed by defendants. Parenthetically, "consists", when used with "of", is defined in Webster's Third New International Dictionary (1971), as "to become composed or made up." Notwithstanding the confusional tone of the answers arising from the former denial and the latter admission, the University, President Olson and Chancellor Schooling, in their joint brief on appeal, disavow any homogeneity, within contemplation of the "Sunshine Law", between defendant, "The Curators of the University of Missouri, a public corporation", and the Board of Curators (whose members were not joined as parties in the instant action).

---

**2.** All statutory references hereafter, unless otherwise indicated, are to RSMo Supp.1975, as amended RSMo Supp.1977, in force and effect on the dates alleged in Tribune's petition. This court is aware that the "Sunshine Law" has been amended since the dates alleged in Tribune's petition; to-wit: Section 610.010, L. 1978, H.B. 882, effective 8–13–78; and Sections 610.010(2)(3)(4), 610.020, 610.025, 610.027 (new) and 610.028 (new), L.1982 H.B. 1253, effective 8–13–82. The amendments which were enacted and became effective in 1978 and 1982, respectively, are not considered in disposing of the matters alleged in Tribune's petition. See, *St. Louis County v. University City,* 491 S.W.2d 497, 499–500 (Mo. banc 1973); and *State ex rel. Hall v. Vaughn,* 483 S.W.2d 396, 398 (Mo. banc 1972).

The University, President Olson and Chancellor Schooling stress at some length in their brief that the nine (9) individuals comprising the Board of Curators, none of whom were joined as defendants, constitute the governing body of "The Curators of the University of Missouri, a public corporation" joined as a defendant in the instant action. In support thereof the University, President Olson and Chancellor Schooling collectively cite Art. IX, § 9(a), Mo. Const. 1945, which reads as follows: "The *government* of the state university shall be vested in a board of curators consisting of nine members appointed by the governor, by and with the advice and consent of the senate." (emphasis added) Although not cited by appellants, § 172.010, RSMo 1969 (now § 172.010, RSMo 1978), parallels the constitutional provision, and reads as follows: "A university is hereby instituted in this state, *the government whereof shall be vested in a board of curators.*" (emphasis added) Section 172.020, RSMo 1969 (now § 172.020 RSMo 1978), cited by appellants, reads, insofar as here pertinent, as follows: "The University is hereby incorporated and created a body politic, and shall be known by the name of 'The Curators of the University of Missouri', and by that name shall have perpetual succession, power to sue and be sued, complain and defend in all courts; to make and use a common seal, and to alter the same at pleasure; to take, purchase and to sell, convey and otherwise dispose of lands and chattels ..." Section 172.020, supra, goes on to prescribe certain limitations on the power of the "curators" to subdivide, sell or convey land, or to sell, or permit the severance of timber, minerals or other natural resources therefrom, and authorizes the "curators" to act as trustee in all cases of "gift[s] of property or property left by will" to the University for its benefit or the benefit of students, and to condemn property for any public purpose within the "scope of its organization" in the same manner provided "in chapter 523, RSMo".

Three companion sections, none of which were cited by any of the parties, also bear mention. Section 172.090, RSMo 1969 (now § 172.090, RSMo 1978), captioned "Officers of the board", reads as follows: "There shall be a president and vice president of the board, who shall be chosen by the board from the members thereof, a secretary, treasurer, and such other officers of the board as they shall deem necessary, who shall be appointed by the board, and hold their offices during the pleasure of the board." Section 172.100, RSMo 1969 (now § 172.100, RSMo 1978), captioned "Board to prescribe own government", reads as follows: "The curators shall have power to make such bylaws or ordinances, rules and regulations as they may judge most expedient for the accomplishment of the trust reposed in them, and for the government of their officers and employees, and to secure their accountability, and to delegate so much of their authority as they may deem necessary to such officers and employees or to committees appointed by the board." Section 172.300, RSMo 1969 (now § 172.300, RSMo 1978), captioned "Employment of faculty and employees—compensation, retirement, death and disability plans", provides, inter alia, as follows: "The curators may appoint and remove, at discretion, the president, deans, professors, instructors and other employees of the university; define and assign their powers and duties, and fix their compensation ..."

■ Although far from models of clarity, a composite reading of the above constitutional provision and statutory enactments leaves no doubt that the governing body or governing authority of the University is the Board of Curators consisting of nine (9) individuals "appointed by the governor, by and with the advice and consent of the senate." By virtue of Article IX, § 9(a), Mo. Const.1945, at least in frame of reference of the "Sunshine Law", the Board of Curators is sui generis; by constitutional mandate it is a separate entity given the status of a public governmental body. It is conceptually distinguishable from a board of directors in the usual corporate sense. Failure to draw this sharp line of distinction between the Board of Curators and "The Curators of the University of Missouri, a public corporation", would subvert the

intent and meaning of Art. IX, § 9(a), Mo. Const.1945.

In all fairness to the Tribune and the trial court, the aura of confusion emerging in appellants' joint brief on appeal was somewhat obfuscated at the trial court level by portions of the respective answers of the University, President Olson and Chancellor Schooling addressing the appellation and status of the governing authority of the University.

At this point it is fitting to return to the allegations and prayer for relief contained in Tribune's petition. Tribune alleged that an informal social meeting held on January 19, 1978, by the Board of Curators (consisting of nine members, appointed by the governor, by and with the advice and consent of the senate), to which a reporter for the Tribune was denied access, was a "public meeting" of a "public governmental body" within the purview of §§ 610.010(2)(3) and 610.015. The Tribune further alleged that its reporter, on January 5, 11, 23 and 25, 1978, was wrongfully denied permission to "read, examine, inspect and duplicate" approximately "eighty (80) internal audit reports" prepared by employees of the University during the previous calendar year and "circulated" to President Olson, a "hospital task force report dealing with recommended changes in the financing and governance of the University of Missouri-Columbia Medical Center", and a feasibility study concerning solicitation of funds to create a medical library at the University of Missouri-Columbia Medical School, as all were "public records" of a "public governmental body" within the purview of §§ 610.-010(2)(4) and 610.015.

The prayer in Tribune's petition sought both declaratory and injunctive relief. Regarding declaratory relief, the Tribune prayed: (1) that meetings such as the one alleged in its petition, as well as all other meetings of "The Curators of the University of Missouri", formal or informal, regular or special, at which any public business was discussed or decided, or public policy was formulated, be declared "public meetings" of a "public governmental body" within the

scope and meaning of §§ 610.010, et seq.; and (2) that the "internal audit reports", "hospital task force report" and "medical library feasibility study" alleged in its petition be declared "public records" of a "public governmental body" within the scope and meaning of §§ 610.010, et seq. Regarding injunctive relief, the Tribune prayed: (1) that "Defendants ... and all persons in active concert with them be enjoined from holding any meetings, formal or informal, regular or special, at which public business is discussed or decided, or public policy is formulated in such a manner" as "to ... exclude therefrom plaintiff's agents and members of the public"; and (2) that "defendants and the agents, servants and employees of the University of Missouri" be enjoined from refusing to make available to plaintiff's agents and members of the public, for inspection and duplication, the "audit reports", "hospital task force report", and "medical library feasibility study".

The judgment and decree of the trial court, which was entered on March 24, 1982, declared the informal social meeting held by the Board of Curators on January 19, 1978, to be a "public meeting" of a "public governmental body" within the meaning of §§ 610.010, et seq., subject to the "notice" requirements therein, and decreed, in broad, sweeping terms, that "*defendants* are hereby enjoined from arranging or holding meetings, formal or informal, regular or special, at which public business is discussed, decided, or public policy formulated, in any manner which excludes plaintiff or the public from attending such meetings." (emphasis added) The judgment and decree of the trial court further declared the "internal audit reports", "hospital task force report", and "medical library feasibility study" to be "public records" of a "public governmental body" within the meaning of §§ 610.010, et seq., and decreed that "defendants" were "enjoined from refusing to make the same available for inspection and duplication by the plaintiff or its agents or the public."

Thumbnail sketches of the operating structures of the University complex and the Board of Curators, as disclosed by the record, are appropriate at this juncture. When juxtaposed with Art. IX, § 9(a), Mo. Const.1945, and §§ 610.010, 610.015, 610.-020, 610.025, 610.030, 172.010, 172.020, 172.-090, 172.100 and 172.300, supra, the concerted effort of appellants in their brief on appeal to distinguish or differentiate between the Board of Curators and "The Curators of the University of Missouri, a public corporation", becomes even more significant.

The University complex is comprised of four campuses—University of Missouri-Columbia, University of Missouri-Rolla, University of Missouri-Kansas City, and University of Missouri-St. Louis. President Olson, by virtue of appointment by the Board of Curators, is chief administrative officer of the University complex. The University complex also has two vice presidents, one for academic affairs and one for administrative affairs. Each of the four campuses has academic and administrative units under the immediate supervision of its respective chancellor. Overall, the University complex employs approximately 15,000 people.

The only positions both filled by and which report directly to the Board of Curators are that of President, General Counsel and Treasurer of the University complex, and Secretary of the Board of Curators. The only committees which report directly to the Board of Curators are the Executive Committee, Finance Committee, Academic Affairs Committee and Physical Facilities Committee. Membership of the four committees just mentioned is comprised solely of members of the Board of Curators. Meetings of the aforementioned committees and of the Board of Curators are open to the public. The following records in the office of the Secretary of the Board of Curators are available to the public for inspection and copying: (1) Minutes of the Board of Curators; (2) Minutes of meetings of the Executive Committee, Finance Committee, Academic Affairs Committee and Physical Facilities Committee of the Board

of Curators; (3) Recommendation papers submitted to the Board of Curators; (4) All "administrative recommendations" made to the Board of Curators; (5) Employment contracts and contract changes; (6) Employment records of all employees; (7) Regulations and Rules of the Board of Curators; (8) Presidential "executive orders"; (9) Presidential "guidelines"; (10) Delegations of authority by the Board of Curators; (11) "Official audits" of the University; and (12) Official correspondence of the Board of Curators.

Attention next focuses on revelations in the record pertaining to the "social meeting" and alleged "public records" (three in number) asserted by the Tribune as the basis for the declaratory judgment and injunctive relief granted by the trial court.

On January 19, 1978, the eve of a regular meeting, an informal "social meeting" was held by the Board of Curators at which time a student exchange program with a Korean university (Chilon National University) was discussed. A reporter for the Tribune was barred attendance.

The "internal audit reports" were an administrative or management tool utilized by President Olson to assist him in the performance of his administrative duties. They were initiated by and submitted to him in his status as chief administrative officer of the University complex. There is not a scintilla of evidence that the "internal audit reports" in question, in part or in whole, were ever submitted to the Board of Curators. They were both performance and fiscal audits with inherent tones of confidentiality by reason of critiques of personnel, disclosure of the location of cash and other assets of the University, and an assessment of security weaknesses in the handling of cash and other assets of the University.

The "hospital task force report" was the progeny of a special committee appointed by President Olson and Chancellor Schooling. The purpose of the special committee was to study and make recommendations to the appointing authorities concerning ad-

ministration and operation of the "University Hospital" located on the University of Missouri-Columbia campus. The report of the special committee, although submitted to the appointing authorities, was never submitted to the Board of Curators. There is not one iota of evidence in the record that the special committee was created at the direction or request of the Board of Curators, or that any recommendations contained in its report, in part or in whole, were ever brought before the Board of Curators for action, or in any way came into fruition.

The "medical library feasibility study" was an administrative undertaking to explore and evaluate the feasibility of an embryonic project to solicit funds from private sources to establish a health-science library. The "study", assisted by a private fund raising organization (paid from University funds), contained a list of potential private donors. Nothing in the record suggests that the project was initiated, directly or indirectly, by the Board of Curators, or ever presented to it for approval, disapproval or consideration. The proposed fund raising project, the subject of the "feasibility study", never got past the administrative level. Ergo, it was never officially adopted, publicly announced, or "kicked off". The "medical library feasibility study" can best be described as an exploratory study which never matured into an affirmative project.

The pleadings, constitutional provisions, statutes, and facts heretofore iterated set the stage for discussion and disposition of the issues raised by appellants on appeal. Six points (containing a total of 20 subpoints) covering approximately eight pages of appellants' brief are relied on. To facilitate disposition, these points, after considerable distillation, are paraphrased as follows: (1) Neither the University (as distinguished from the Board of Curators), President Olson nor Chancellor Schooling constituted a "public governmental body" in the context of the "Sunshine Law"; (2) The "internal audit reports", "hospital task force reports", and "medical library feasibility study" were not "public records" within the ambit of §§ 610.010, et seq., because they were inter-

nal management tools devised to assist President Olson and Chancellor Schooling in the performance of their administrative duties as opposed to records instigated by or submitted to the Board of Curators, the "public governmental body" per §§ 610.010, et seq., for utilization by the latter in formulating policies, rules and regulations for governing the University; (3) Assuming, arguendo, that the meeting of the Board of Curators and the records in question constituted a "public meeting" and "records" of a "public governmental body" within the scope and meaning of §§ 610.010, et seq., injunctive relief was imprudently granted because no evidence was adduced to support a finding by the trial court that reasonable grounds existed to believe that the acts sought to be enjoined would in all probability be committed absent issuance of an injunction; (4) That portion of the decree enjoining "*defendants* from arranging or holding meetings, formal or informal, regular or special, at which public business is discussed, decided, or public policy formulated, in any manner which excludes plaintiff or the public from attending such meetings" (emphasis added) was overly broad, and thereby patently invalid, because it exceeded the bounds of the pleadings and evidence, and failed to exclude any of the exceptions contained in § 610.025; (5) That portion of the decree immediately heretofore referred to enjoining defendants violated Rule 92.02(d) because its lack of specificity makes it impossible to determine the persons or entities enjoined and the meetings proscribed; and (6) That portion of the decree heretofore referred to was erroneous in so far as it was directed to President Olson and Chancellor Schooling because neither were empowered to call meetings of the Board of Curators or dictate the nature of such meetings.

The points relied on by appellants on appeal, as a practical matter, divergently pose one basic question—were the University, President Olson and Chancellor Schooling "public governmental bodies" within the scope and meaning of §§ 610.010, et seq. The answer to this question provides

the key to virtually all of the issues raised by appellants.

Because no common law right existed for the public to be privy to the conduct of government business, and no constitutionally premised right had emerged, the respective legislative bodies of the fifty states proceeded to fill the void by enactment of what are nominally referred to as "open meeting" or "sunshine" laws. Such were obviously motivated by an ever increasing public demand for government accountability, coupled with the belief that such could be best achieved in open forums.

■ Unfortunately, legislation enacted by the various states in this field varies so from state to state, and has been so frequently amended on an ad hoc basis and so divergently construed by judicial opinions, that decisions from other jurisdictions are of little help in resolving the present appeal. Of necessity, no escape lies from carefully analyzing §§ 610.010, et seq., to determine their scope and application. Due to lack of a state counterpart to the Congressional Record to turn to for aid, there is no judicial task more arduous, no judicial responsibility heavier. Nevertheless, courts are impressed with a judicial obligation to ascertain legislative intent and the scope and application of statutes in justiciable controversies however laden with difficulty the task may be. *State ex rel. Union Electric Light & Power Co. v. Baker*, 316 Mo. 853, 293 S.W. 399, 401 (banc 1927).

■ Rules or canons of construction, whose numbers are legion, have been promulgated to assist in the performance of this herculean task. Although widely diverse in nature and many times conflicting, one cardinal rule or canon, free of diversity or conflict, stands out with stark clarity— the intent of the legislature controls. As succinctly put in *Edwards v. St. Louis County*, 429 S.W.2d 718, 722 (Mo. banc 1968), "[i]n all these diverse and sometimes conflicting rules the ultimate guide is the intent of the legislature; the other rules of construction may be considered merely as aids in reaching that result; and the purpose and object of the legislation should not be lost sight of."

■ Ascertainment of legislative intent is therefore both the goal and ultimate rule of statutory construction. The only subordinate aids which should be resorted to are those which subserve rather than subvert legislative intent. Consistent with this thought the following rules or canons of construction are perceived as subserving ascertainment of the legislative intent pervading Missouri's "Sunshine Law." It is assumed that the intent of the legislature in enacting a statute is to serve the best interests and welfare of the citizenry at large. *Cohen v. Poelker*, 520 S.W.2d 50, 52 (Mo. banc 1975). This assumption must strike a proper balance with the further assumption that the legislature did not intend to effect an unreasonable, oppressive or absurd result. *State ex rel. Dravo Corporation v. Spradling*, 515 S.W.2d 512, 517 (Mo.1974); and *Hyde v. City of Columbia*, 637 S.W.2d 251, 262–63 (Mo.App.1982). Definitions of words or phrases incorporated in a statute supersede commonly accepted dictionary or judicial definitions. *In re Estate of Hough*, 457 S.W.2d 687, 691 (Mo.1970); *State ex rel. Exchange Bank of Richmond v. Allison*, 155 Mo. 325, 56 S.W. 467, 468 (1900); and *Fox v. Standard Oil Co. of New Jersey*, 294 U.S. 87, 96, 55 S.Ct. 333, 337, 79 L.Ed. 780 (1935). It is axiomatic that legislative intent embodied in §§ 610.010, et seq., supra, must be determined from what the legislature expressly said or from what can be necessarily implied from the language it employed, and not from what this court speculates the legislature may have intended to say or inadvertently failed to say.

The above comprises a legal matrix from which to discern the legislative intent permeating Missouri's "Sunshine Law". The antipodal positions taken by the adversaries on this appeal are not always marked by an objective commitment to divining legislative intent because, as is frequently the case, they intermittently reflect "overkill" employed to advance their respective positions.

As previously noted, most, if not all, of the issues raised on appeal turn on what constitutes a "public governmental body". Syllogistically, what constitutes a "public record" neatly falls into place when the existence of a "public governmental body" has been ascertained, as § 610.010(4) defines "public record" as "any record retained by or of any *public governmental body*." (emphasis added)

Notwithstanding the well-intentioned efforts of the legislature, it is patent that the statutory definition of "public governmental body", § 610.010(2), is so prolix as to raise the specter of an overly expansive meaning going far beyond the legislative intent inherent in the "Sunshine Law". The principal case in this state circumscribing the statutory definition of "public governmental body" is *Cohen v. Poelker*, supra, 520 S.W.2d at 52. There the court pointedly observed that "[t]he definition of 'public governmental body' *refers to* and includes constitutional and statutory *governmental* bodies or entities at all levels in the state; for example: the 'state' itself, 'any political subdivision of the state,' the 'county,' the 'municipal government,' the 'school district,' the 'special purpose district,' etc." (emphasis added)  The court further observed that "[b]y including in the definition any 'agency,' 'board,' 'bureau,' 'commission,' 'committee,' 'department' and 'division,' the General Assembly was recognizing some of today's forms of entities through which the several levels of governmental bodies function" noting that "[i]t is these agencies, commissions and departments and their members which have 'meetings'; not the state, county, municipality or district."·

With reference to *Cohen v. Poelker,* supra, the "state" is the level of government involved in the instant case as the University is a "state" supported institution. The Board of Curators is the entity through which the "state" functions in governing the University. Art. IX, § 9(a), Mo. Const., 1945, and § 172.010, supra. See also *State v. Neill,* 397 S.W.2d 666, 669 (Mo. banc 1966) holding that "the 'government' of the University is committed to the Cura-

tors both by the Constitution and the statutes . . . ."

By its very nature, the quintessence of a "public governmental body" is the power to govern by the formulation of policies and the promulgation of statutes, ordinances, rules and regulations, or the exercise of quasi-judicial power. It defies semantics to believe that the legislature intended inclusion of bodies or entities barren of the power to govern in the definition of "public governmental body". If such were intended, a simple stroke of the pen striking the adjective "governmental" would have made it a fait accompli. Sound logic and implacable reasons as justification for not having done so quickly surface. Neither the letter nor the spirit of the "Sunshine Law" presaged an era wherein purely administrative meetings and administrative functions of public bodies without power or authority to govern were to be subject to public participation.

The legislature saw fit to strike a pragmatic balance between opening to the public carte blanche the vast majority of meetings and records of "public governmental bodies", i.e. those empowered to govern, and excluding public participation and access carte blanche to administrative meetings and records of public bodies devoid of governing authority. To subject the latter to the "open meeting" and "open record" requirements of the "Sunshine Law" would be unduly disruptive, counter-productive to administrative efficiency, and non-productive as a practical matter insofar as making the public privy to policy decisions and the promulgation of statutes, ordinances, rules and regulations which, in the instant case, are exclusively within the jurisdictional and governing authority of the Board of Curators by virtue of Art. IX, § 9(a), Mo. Const. 1945 and § 172.010, supra. Inclusion of "public governmental bodies" possessed of power and authority to govern and exclusion of public bodies limited to administratively carrying out policies and rules and regulations formulated and promulgated by their governing authority appears to adequately meet the public's interest in having

the decisional level of public business conducted in plain view. At the same time it avoids the crippling consequences of placing unjustifiable impediments on achieving day-to-day administrative efficiency. Securing government accountability at the decisional level is one thing. Adversely affecting administrative efficiency at the non-decisional level is quite another thing. It is inconceivable that the salutary goal of letting the "sunshine" in on meetings of "public governmental bodies" envisioned elimination of all intermediate layers of ozone to the extent of crippling or impeding the day-to-day efficiency of purely administrative functions.

■■■■ It is now appropriate to superimpose what has heretofore been said upon the facts of this case. Appellants do not, per se, challenge the judicial declaration by the trial court that the January 19, 1978, "social meeting" of the Board of Curators constituted a "public" meeting of a "public governmental body" within the purview of § 610.010(3) defining "public meeting" as "any meeting, formal *or informal,* of any public governmental body, *at which any public business is discussed,* decided or public policy formulated." (emphasis added) The Board of Curators was a "public governmental body". "Public business", i.e. a student exchange program with Chilon National University, was discussed at the January 19, 1978, "social meeting" held by the Board of Curators.[3]

Appellants do, however, completely disassociate themselves from any applicability or binding effect of the judicial declaration previously mentioned because it entailed an adjudication affecting only the Board of Curators, none of whose members were parties to the action, thereby stripping it of any legal efficacy. Use of the term "public governmental body" in the "Sunshine Law", in and of itself, connotes a sharply etched and meaningful distinction between the Board of Curators and "The Curators of the University of Missouri, a public corporation" insofar as application of the "Sunshine Law" is concerned. Any conflicting

admissions by those joined as parties were not binding on the Board of Curators and did not serve to infuse the judicial declaration with validity.

■■■■ A major complaint of appellants is that the cognate injunctive relief decreed by the trial court was overly broad, to-wit, "defendants are hereby enjoined from arranging or holding meetings, formal or informal, regular or special, at which public business is discussed, decided, or public policy formulated, in any manner which excludes plaintiff or the public from attending such meetings." That portion of the decree just mentioned cannot stand for several reasons. One, it summarily purports that the University is a "public governmental body" within the scope and meaning of the "Sunshine Law". This court, by its opinion herein, holds that the University was not a "public governmental body" within the scope and meaning of the "Sunshine Law". Two, it summarily purports that President Olson and Chancellor Schooling were "public governmental bodies" within the comtemplation of the "Sunshine Law". Clearly, they were outside the ambit of the "Sunshine Law". They were executive officers of the University. They were neither an "agency", "board", "bureau", "commission", "committee", "department" nor "division" of the Board of Curators in the context of the "Sunshine Law". The mere fact that they carried out directives, policies, rules and regulations of the Board of Curators on a day-to-day basis did not make them the alter ego of the Board of Curators for policy decisions and the promulgation of rules and regulations for governing the University. Nor did the mere fact that they might hold staff meetings or appoint ad hoc committees for fact-finding purposes to assist them in the performance of their administrative duties ipso facto make them "public governmental bodies" under the "Sunshine Law".

Attention next focuses on the "internal audit reports", "hospital task force report" and "medical library feasibility study". As previously noted, if they were not records

---

**3.** This court in no way implies that the Board of Curators as a body can never meet informally on a social basis; however, the Board of Curators cannot meet under the guise of an informal social meeting to circumvent the "Sunshine Law".

of a "public governmental body", they were not "public records . . . open to the public for inspection and duplication" under § 610.015. Even though this court has heretofore concluded that none of the named defendants, the University, President Olson or Chancellor Schooling, was a "public governmental body" within the discipline of the "Sunshine Law", it still behooves this court to explore whether the records in question were records of the Board of Curators.

Section 172.100, supra, expressly empowers the Board of Curators to "make such bylaws or ordinances, rules and regulations as they may judge most expedient for the accomplishment of the trust reposed in them." The same statutory provision also empowers the Board of Curators to "delegate so much of their authority as they may deem necessary to such officers and employees or to committees appointed by the board." Section 172.300, supra, provides, inter alia, that the Board of Curators "may appoint and remove, at discretion, the president, deans, professors, instructors and other employees of the University."

According to the record, the "internal audit reports" were management tools employed by President Olson and his staff to assess the performance of personnel and monitor funds and property of the University complex. There is not a scintilla of evidence that the "internal audit reports" were ever filed with or became a part of the records of the Board of Curators. More importantly, there is not a scintilla of evidence that President Olson and his staff had either de jure authority delegated by the Board of Curators or de facto authority by grace of the Board of Curators to make policy decisions, or issue rules or regulations to effect changes that might be indicated by the "internal audit reports". Short of presentation to the Board of Curators either for informational or decisional purposes, the "internal audit reports" did not rise to the level of "public records" of a "public governmental body" within the ambit of the "Sunshine Law".

Addressing the "hospital task force report", the record discloses that it was the work product of a special committee appointed by President Olson and Chancellor Schooling to study and make recommendations to them regarding administration and operation of the "University Hospital". The "hospital task force" committee, by reason of its appointing authorities, was an administrative adjunct rather than an adjunct of the Board of Curators. The record is devoid of any evidence that either the appointing authorities or the "hospital task force" exercised de jure or de facto authority emanating from the Board of Curators to effect policy changes or rules or regulations governing the operation of the "University Hospital", or, concomitantly, that its report was ever filed with or submitted to the Board of Curators for informational or decisional purposes. As garnered from the record it is implicit that the "hospital task force" was nothing more than an ad hoc fact-finding committee to assist the administrative hierarchy of the University in evaluating whether policy, rule or regulation changes should be recommended to the Board of Curators affecting the operation of the "University Hospital". As previously noted, the "hospital task force report" never ripened into fruition. The "hospital task force report", like the "internal audit reports", never rose to the level of "public records" of a "public governmental body" within the ambit of the "Sunshine Law".

According to the record, as previously iterated, the "medical library feasibility study" was an administrative undertaking to explore and evaluate the feasibility of an embryonic project to solicit funds from private sources for establishment of a health-science library. The record is silent of any suggestion that the study was initiated or conducted under de jure or de facto authority of the Board of Curators or that it was ever submitted to the Board of Curators for any purpose, informational, decisional or otherwise. The fact is the "medical library feasibility study" withered at the administrative level without ever being further pursued. Similar to the "internal audit reports" and the "hospital task force report", the "medical library feasibility study" fell short of being a "public record"

of a "public governmental body" within the meaning of the "Sunshine Law".

As significantly observed by the Supreme Court of Oklahoma in *Sanders v. Benton,* 579 P.2d 815, 819 (Okl.1978), "[a]lthough different courts must construe different statutory provisions, it appears that the majority of other jurisdictions have generally held that ad hoc committees or citizen advisory committees, empaneled for the purpose of furnishing information and recommendations to governing or decision-making entities, are not subject to the open meeting laws unless they have actual, or de facto decision-making authority."

The authority vested in the Board of Curators by § 172.100, supra, to delegate "their authority" to officers and employees of the University complex and to board-appointed committees makes it impossible to neatly compartmentalize all committees and reports at the administrative level for purposes of application vel non of the "Sunshine Law". If decisional authority beyond the perimeters of policies, rules and regulations previously formulated and promulgated by the Board of Curators is delegated by the Board of Curators to persons or committees in designated instances, then their meetings and reports take on a different complexion for purposes of ascertaining whether the "Sunshine Law" comes into play.[4] By the same token, de facto authority assumed and exercised by persons or committees at the administrative level, and, tacitly approved, summarily accepted or "rubber stamped" by the Board of Curators, takes on a different complexion for purposes of ascertaining whether the "Sunshine Law" comes into play. Otherwise the "Sunshine Law" could be effectively foiled. This court is quick to point out that the record in the instant case neither discloses nor suggests that the Board of Curators ever entertained, much less engaged, in any ploy to circumvent the "Sunshine Law".

Although a well-informed electorate is the cutting edge of a representative form of government, it does not necessarily follow that unbridled public excursions into every nook and cranny of day-to-day administrative functions best hones this cutting edge when balanced against the ever-present risk of impairing administrative efficiency without commensurate benefits. In sum, none of the named defendants (the University, President Olson or Chancellor Schooling) fall within the statutory definition of a "public governmental body", and, concomitantly, none of the "records" fall within statutory definition of "pubic records" of a "public governmental body".

The declaratory judgment and implemental decree of injunction entered by the trial court must be reversed and vacated as they rest upon erroneous declarations and applications of the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

Declaratory judgment reversed and implemental decree of injunction vacated.

All concur.

---

4. Section 610.010(2) was amended in 1978 (RSMo 1978) to include "any committee appointed under the direction or authority of any of the above named entities and which is authorized to report to any of the above named entities" in the definition of "public governmental body."