Dear Representative Harpool:
This opinion is in response to your question asking:
 Is the Student Government Association of Southwest Missouri State University a "public governmental body" as defined in Section 610.010(2), RSMo 1986?[1]
In order for the provisions of Sections 610.010 through610.030, RSMo 1986 (the "Sunshine Law") to be applicable to a particular entity, that entity must be one of the four types described in Section 610.010(2) as a "public governmental body". As the court in MacLachlan v. McNary, 684 S.W.2d 534,536 (Mo.App. 1984) set forth:
Public governmental body is defined as:
 1. Any legislative or administrative governmental entity created by the constitution or statute of this state, by order or ordinance of any political subdivision or district, or by executive order including any body, agency, board, bureau, counsel, commission, committee, department, or division of the state, of any county or of any municipal government, school district or special purpose district;
 2. Any other legislative or administrative governmental deliberative body under the direction of three or more elected or appointed members having rule-making or quasi-judicial power;
 3. Any committee appointed by or under the direction or authority of any of the above-named entities and which is authorized to report to any of the above-named entities; and
4. Any quasi-public governmental body.
Id. at 536.
In construing this section, the court in Tribune PublishingCompany v. Curators of University of Missouri, 661 S.W.2d 575,584 (Mo.App. 1983) stated:
 By its very nature, the quintessence of a "public governmental body" is the power to govern by the formulation of policies and the promulgation of statutes, ordinances, rules and regulations, or the exercise of quasi-judicial power.
Many different canons of legislative construction are cited by Missouri courts when construing the Sunshine Law. See, for example, Tribune Publishing Company v. Curators of Universityof Missouri, supra, at 583, Remington v. City of Boonville,701 S.W.2d 804, 806 (Mo.App. 1985); and, MacLachlan v. McNary,supra, at 537. Basically, the courts all agree that the law must be read to mean what the legislature intended from the plain meaning of the words used. The Sunshine Law is "to be construed liberally in favor of open government," MacLachlan v.McNary, supra, at 537, but in a way that a proper balance is struck between the competing interests of the public and government so that there is no "unreasonable, oppressive or absurd result." Tribune Publishing Company v. Curators of Universityof Missouri, supra, at 583.
The threshold question is whether the Student Government Association (hereinafter "SGA") is an "entity" separate and apart from the Board of Regents and the University. If so it must be determined whether it falls within one of the four categories of "public governmental bodies" in Section610.010(2).
This office has discovered no cases in Missouri or other jurisdictions which discuss whether student government associations are public governmental entities.[2] However, courts have reached conclusions about the relationship of colleges and universities with their respective student government associations in circumstances similar to those at Southwest Missouri State University. In Arizona Board ofRegents v. Zappia, 577 P.2d 735 (Ariz.App. 1978), the student government association at the University of Arizona (Associated Students of the University of Arizona, or ASUA) successfully sued the university over the amount of fees charged to certain part-time students. The court affirmed that judgment on appeal and noted that the court had, in a companion case, held that an unincorporated association, such as ASUA had no capacity to sue. Id. 736-737. The court went on to rule that ASUA also had no right to contract for the services of an attorney because state law required all state agencies to use the attorney general's office.
 From the foregoing facts, it appears that whatever powers (as distinguished from rights) ASUA may have are derived from, and thus may not transcend, the administrative powers of the Board of Regents for the government of the institutions under its jurisdiction. ASUA has no existence separate and apart from the University of Arizona. See University of South Florida Student Government v. Trundle, 336 So.2d 488
(Fla.App. 1976), cert. den. 348 So.2d 954. The Board of Regents is a state agency, . . . . Id. at 738.
The Trundle case relied on by the Arizona court involved a claim for damages by a student who alleged that she had been injured as a result of the negligence of an instructor in a self-defense class sponsored by the student government at the University of Florida. The appeal was from the denial of a motion by the student government defendant to quash service of process made upon its president.
 Much of the argument before this court has centered upon whether an unincorporated association can be sued and served as a separate entity. . . . We find it unnecessary to resolve this issue because we have concluded that the student government association is simply a part of the University.
 Under Chapter 240, Florida Statutes, the Board of Regents is charged with the responsibility of operating the state's university system. Pursuant to Fla. Stat. Section 240.042(2)(a) (1974), the Board of Regents is empowered to establish rules under which the state's university system shall be managed. Student Government is authorized under Board of Regent Rule 6C-6.12 with the proviso "that ultimate authority for university affairs rests with the administration of each university." The president of the university maintains a veto over the budgeted expenditures of Student Government from student activity fees. Fla. Stat. Section 240.0951 (1974). While Student Government is granted certain freedoms, the final authority for its activities necessarily rests with the president of the university.
 Thus, it appears that the University of South Florida Student Government has no existence separate and apart from the University of South Florida.[1] Jurisdiction over the state or the University cannot be acquired by service of the president of Student Government.
 [1] Tactically, the question of whether Student Government is an instrumentality of the state may be exceedingly important in this case because appellee's injury occurred at a time when the state maintained sovereign immunity. University of South Florida Student Government v. Trundle, supra, at 489.
In Sellman v. Baruch College of City University of NewYork, 482 F. Supp. 475 (S.D. N.Y. 1979), an action was brought under 42 U.S.C. § 1983 and directly under the federal constitution to have declared void as violative of the First,Fifth and Fourteenth Amendments to the United States Constitution a provision of the Baruch College student government constitution requiring candidates for elective position to be registered for a minimum of twelve credits and to maintain a grade average of 2.5. The plaintiff claimed that the actions of his fellow students in ratifying the student constitution, and of the Election Committee in enforcing it, constituted state action. In deciding whether there was "state action" for purposes of the Fourteenth Amendment and whether the deprivation of rights was "under color of state law" for purposes of Section 1983, the court examined the facts to see if the "`State has so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity. . . .'" [Footnote omitted]Id. at 478, quoting from Burton v. Wilmington ParkingAuthority, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45
(1961).
 The facts in the instant case appear even more compelling than those in Burton, supra. Although City officials did not write or ratify the challenged provisions of the student constitution, the City was nevertheless a "joint participant" in the challenged activity. Baruch College is a public institution, built for public purposes, funded with public money, and staffed by public employees. Although the student government enjoys a measure of autonomy, nevertheless it is a creature of governmental agencies. Its branches are advised and guided by faculty members; its constitution is required to be compatible with guidelines fostered by the Board of Higher Education; the Dean of Students, a government employee, is the final arbiter of election disputes. The student government receives money, both to cover its operating expenses and to fund the activities it supervises, from mandatory student fees collected by the College from the entire student body. Finally, its meetings are held on campus during hours specifically set aside by the College for student activities; thus, it may be presumed that both the College and the students derive benefit from this interlocking relationship. Although none of these factors, standing alone, would constitute the requisite degree of state involvement, in combination, they do. The plaintiff has met the threshold requirement. The state is sufficiently involved in the governance and control of Baruch College that the actions of its student government may be attributed to the state itself; the policies of the student government are held to the same constitutional standards as those that apply to the state. [Footnotes omitted.] Id. at 478-479.
(Emphasis added.)
An analysis of the Student Government Association at Southwest Missouri State University in light of these holdings must begin with an examination of the facts and circumstances.
The Student Government Association is recognized by Southwest Missouri State University as "the official body representing the students of Southwest Missouri State University." Article I, Section 4 of the SGA Constitution. The following description of the characteristics and functions of the SGA are taken not only from its constitution but also from the official publications of the University, namely, the StudentOrganization Handbook 1986-1987; Bear Facts 1986-87 and theSouthwest Missouri State University Bulletin 1986. Facts were also obtained in discussions with the faculty advisor to the SGA.
The SGA provides the means by which students can participate in campus governance, in student discipline, in the management of student activities and in academic decision making. It has a constitution approved by the president of the University, on behalf of the Board of Regents, and which can be amended only with his approval. It is not incorporated. The University provides that all undergraduate students are automatically members of the SGA and officially encourages them to participate in the SGA activities. In fact, the University's statement of "Students Rights and Responsibilities" includes the "[r]ight to be represented in student affairs through their constitutional government and various committees of the University." Bear Facts 1986-87, p. 28. The SGA is financed by moneys from the University's general fund as appropriated by the Board of Regents.
According to its constitution, the SGA has executive, legislative and judicial branches. The executive branch includes the president, vice-president and president of the senior class as well as commissions appointed by the president of the SGA. These officials are elected by the student body with the senior class electing its own president.
The legislative branch is called the Student Senate. It is made up of representatives of various portions of the student body who are elected by those students. Among other things, the Student Senate budgets and allocates funds assigned to the SGA by the University; selects faculty or administration advisors in addition to the vice-president for student affairs who is the permanent advisor; approves constitutions of organizations on campus and amendments thereto and reviews the constitutions every two years; and, selects student officials to manage or direct any student activities funds including the University newspaper and yearbook.
The judicial branch is called the Campus Judicial Board whose purpose it is to "provide students with representative voice in the regulation of their actions and to encourage their participation in an understanding of the administration of justice." Article IV, Section 2 of the SGA Constitution. This board is composed of five students nominated by a group of professors, students and administrative personnel. The nominating group is appointed by the president of the University. The nominees are approved by the Senate with a chief justice being chosen from among them. All student organizations and all students enrolled in the University are subject to the jurisdiction of this Board. Besides having the power to interpret the SGA Constitution and try impeachment charges against SGA officers, it has appellate and original jurisdiction in various cases involving conflicts between student organizations and in cases of offenses against University regulations.
The SGA is particularly involved in the regulation of student organizations. All student organizations must be registered and have articles of registration before they can receive the privileges accorded to student organizations. These privileges include the use of campus facilities, bulletin boards, University support services, campus facilities and services for the generation of funds; the right to meet and hold activities on campus; the right to distribute and receive mail through the Student Life office; and the right to receive the assistance of Student Life and Student Activities staffs in planning activities. Student Organization Handbook 1986-1987,
p. 3. These organizations are subject to the constitution of the SGA and must have registration approved by the SGA after a recommendation by the Dean of Student Life and a Board of Registration. Organizations may be suspended or have registration withdrawn by action of the Campus Judicial Board or the Dean of Student Life if members or sponsored activities violate the laws of the community, the policies of the University or the organization's own constitution. The suspension can be lifted only with the concurrence of the judicial authority which imposed it and the approval of Student Life and the Student Government Association.
The SGA grants a certain number of "Student Government Association Scholarships" to freshmen and upper classmen based on good scholastic standing and financial need.
The Board of Regents and the University actively support the SGA and encourage student participation in it. They see the SGA as playing an essential part of the University's mission to mold educated citizens of its students.
 Student organizations. Student organizations are an integral part of the SMS experience. These organizations make significant contributions to the intellectual, cultural, recreational, social, and spiritual life of the University. Students are encouraged to participate in the activities of at least one organization and may organize for any purpose consistent with the educational objectives of the University.
 Each undergraduate student is a member of the Student Government Association. Through the Student Senate students participate in campus government, in the management of student activities and affairs, in student discipline, and in academic decision making. Southwest Missouri State University Bulletin 1986, at page 41.
(Emphasis added.)
An analysis of these facts and circumstances leads to the conclusion that the SGA is a part of the University and in some of its functions plays an integral part of the plan by which the Board of Regents governs the University. The Board of Regents of Southwest Missouri State University is, of course, a "public governmental body" under the Sunshine Law, because it is an administrative governmental entity created by state statute to govern the University. See Sections 174.040, 174.110, and174.120, RSMo 1986, and Tribune Publishing Company v. Curatorsof University of Missouri, supra, at 584.
Section 174.120 provides:
 Each state teachers college shall be under the general control and management of its board of regents, and the board shall possess full power and authority to adopt all needful rules and regulations for the guidance and supervision of the conduct of all students while enrolled as such; to enforce obedience to the rules; to invest the faculty with the power to suspend, or expel any student for disobedience to the rules or for any contumacy, insubordination, dishonesty, drunkenness or immoral conduct; . . .; and to have the entire management of the college, including qualifications for admission.
(Emphasis added.)
The board has delegated either expressly or tacitly some of its authority over student affairs to administrative officers such as the president of the University. The president in turn has exercised that authority by agreeing with the SGA to allow that organization to be the only entity which represents all the students' interests before the Board of Regents and the University. The president has also agreed, by his approval of the SGA constitution on behalf of the Board of Regents, to allow the SGA to participate in the "governance" of the University. See, for example, the functions of the Student Senate and the Campus Judicial Board, as described earlier in this opinion.
Recognition that the SGA plays a role in its "governance" has been made explicit in the above-quoted material from page 41 of the official Southwest Missouri State University Bulletin1986 as well as in the following:
 Governance. Southwest Missouri State University is under the general control and management of a six-member Board of Regents which is charged with the responsibility and authority to adopt administrative policies and procedures relevant to the management of the University. The President is the chief executive officer of the University, responsible to the Board of Regents for the administration of institutional policies and operations. The senior administrative officers of the University serve as an advisory body to the President and are responsible for specific operational divisions of the University . . . . The Student Government Association provides the means by which students can participate in campus governance, in student discipline, and in the management of student activities.
 To formulate policy, to facilitate decision making, and to promote a spirit of collegiality, the University is committed to participatory governance and to an open system of communication throughout the University. Southwest Missouri State University Bulletin 1986, at page 10.
(Emphasis added.)
Whether the records, meetings and votes of the SGA must be open under the Sunshine Law is an issue which must be decided under the principles set forth in Tribune Publishing Company v.Curators of University of Missouri, supra. In that case, the court held that, absent a delegation of policy-making or rule-making authority ("governing authority") to executive officers of the University of Missouri, those officers were not public governmental bodies under the Sunshine Law and their records were not open under that law unless and until they became records of the Board of Curators by submission to that board for informational or decisional purposes. Id. at 585-586.
 There is not a scintilla of evidence that the "internal audit reports" were ever filed with or became a part of the records of the Board of Curators. More importantly, there is not a scintilla of evidence that President Olson and his staff had either de jure authority delegated by the Board of Curators or de facto authority by grace of the Board of Curators to make policy decisions, or issue rules or regulations to effect changes that might be indicated by the "internal audit reports". Short of presentation to the Board of Curators either for informational or decisional purposes, the "internal audit reports" did not rise to the level of "public records" of a "public governmental body" within the ambit of the "Sunshine Law". Id. at 586.
 The record is devoid of any evidence that either the appointing authorities or the "hospital task force" exercised de jure or de facto authority emanating from the Board of Curators to effect policy changes or rules or regulations governing the operation of the "University Hospital", or, concomitantly, that its report was ever filed with or submitted to the Board of Curators for informational or decisional purposes. As garnered from the record it is implicit that the "hospital task force" was nothing more than an ad hoc fact-finding committee to assist the administrative hierarchy of the University in evaluating whether policy, rule or regulation changes should be recommended to the Board of Curators affecting the operation of the "University Hospital". As previously noted, the "hospital task force report" never ripened into fruition. The "hospital task force report", like the "internal audit records", never rose to the level of "public records" of a "public governmental body" within the ambit of the "Sunshine Law". Id. at 586.
 If decisional authority beyond the perimeters of policies, rules and regulations previously formulated and promulgated by the Board of Curators is delegated by the Board of Curators to persons or committees in designated instances, then their meetings and reports take on a different complexion for purposes of ascertaining whether the "Sunshine Law" comes into play.[4] By the same token, de facto authority assumed and exercised by persons or committees at the administrative level, and, tacitly approved, summarily accepted or "rubber stamped" by the Board of Curators, takes on a different complexion for purposes of ascertaining whether the "Sunshine Law" comes into play. Otherwise the "Sunshine Law" could be effectively foiled.
 [4] Section 610.010(2) was amended in 1978 (RSMo 1978) to include "any committee appointed under the direction or authority of any of the above named entities and which is authorized to report to any of the above named entities" in the definition of "public governmental body." Id. at 587.
In light of the above, this office concludes that each of the specific functions of the SGA would have to be examined in light of these principles to determine if the pertinent records, meetings and votes are open. In addition, the provisions of subsections 1, 3 and 4 of Section 610.025 allowing for closed records, meetings and votes must be considered to determine if they are applicable in any specific instance.
CONCLUSION
Therefore, it is the opinion of this office that, while the Student Government Association of Southwest Missouri State University is not normally a "public governmental body" as defined in Section 610.010(2), RSMo 1986, the provisions of Sections 610.010 to 610.030, RSMo 1986, applicable to "public governmental bodies" may become applicable to the Student Government Association when it participates by way of delegation from the Board of Regents in decisional authority beyond the perimeters of policies, rules and regulations previously formulated and promulgated by the Board of Regents or when the Student Government Association exercises de facto authority tacitly approved or summarily accepted by the Board of Regents.
Very truly yours,
 WILLIAM L. WEBSTER Attorney General
[1] Section 610.010(2) has been revised by House Committee Substitute for Senate Substitute for Senate Bill No. 2, 84th General Assembly, First Regular Session, effective September 28, 1987. Such section as enacted by this bill provides:
 610.010. As used in sections 610.010
to 610.030 and 610.100 to 610.115, unless the context otherwise indicates, the following terms mean:
* * *
 (2) "Public governmental body": any legislative, administrative governmental entity created by the constitution or statutes of this state, by order or ordinance of any political subdivision or district, or by executive order, including any body, agency, board, bureau, council, commission, committee, board of regents or board of curators of any institution of higher education, supported in whole or in part from state funds, advisory committee or commission appointed by the governor by executive order, department, or division of the state, of any political subdivision of the state, of any county or of any municipal government, school district or special purpose district, any other legislative or administrative governmental deliberative body under the direction of three or more elected or appointed members having rulemaking or quasi-judicial power, any committee appointed by or under the direction or authority of any of the above named entities and which is authorized to report to any of the above named entities, and any quasi-public governmental body. The term "quasi-public governmental body" means any corporation organized or authorized to do business in this state under the provisions of chapter 352, 353, or 355, RSMo, or unincorporated association which (A) performs a public function, and which (B) has as its primary purpose to enter into contracts with public governmental bodies, or to engage primarily in activities carried out pursuant to an agreement or agreements with public governmental bodies; except urban redevelopment corporations organized or authorized to do business under the provisions of chapter 353, RSMo, which are privately owned, operated for profit, and do not expend public funds;
* * *
The revisions to Section 610.010(2) by this bill do not affect the conclusion reached herein.
[2] In Carter v. Fench, 322 So.2d 305 (La.App. 1975);aff'd., 325 So.2d 277 (La. 1976) the court held that a student government association was subject to Louisiana's open records law because it received public funds. Under Louisiana law, receipt of public funds made records pertaining to those funds open to the public whether the entity receiving them was itself public or private. LSA-R.S. 44:1. Id. at 307. There was no discussion helpful to those types of issues relevant under Missouri's Sunshine Law.
In Marston v. Gainesville Sun Publishing Co., Inc.,341 So.2d 783 (Fla.App. 1976), cert. denied, 352 So.2d 171 (1977), the court held that student disciplinary hearings of the University of Florida's Honor Court were not open to the public under the public meetings law because to so hold would negate the purpose and effect of a more recent statute limiting access to records which the university system maintains on students to the student, the parent or guardian of the student, and to certain members of the professional staff of the university. Id. at 785-786. The court expressly withheld any ruling on "whether disciplinary sessions of the Honor Court would otherwise constitute `meetings of . . . [a] board or commission of . . . [a] state agency or authority." Sec.286.011(1), F.S. 1975." Id. at 786.